[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 987 
Eugene Clemons II was charged with murder. The indictment charged that the murder was made capital murder, on two bases — that it occurred during the course of a robbery and that the victim was a law enforcement officer who was killed in the line of duty. See § 13A-5-40(a)(2) and (a)(5), Ala. Code 1975. Clemons was convicted of the capital offense of murder during a robbery. The jury unanimously recommended that he be sentenced to death by electrocution. The trial court accepted the jury's recommendation and sentenced Clemons to death. The Court of Criminal Appeals affirmed Clemons's conviction and death sentence. Clemons v. State, 720 So.2d 961
(Ala.Cr.App. 1996).
The facts are as follows: On May 28, 1992, Douglas Althouse, a special agent with the Drug Enforcement Administration (DEA), was shot and killed during a carjacking in Shelby County.[1]
As part of his job, Althouse was working on an investigation with Sergeant Mark Hobbs of the Hoover Police Department. Hobbs and Althouse planned to meet on the evening of Thursday, May 28, 1992, between 10:00 and 11:00 p.m. to discuss search warrants to be executed the following day. Jefferson County sheriff's deputy Naylor Braswell, who shared an apartment with Althouse, agreed to go with Althouse to meet with Hobbs.
Braswell and Althouse left for the meeting shortly before 10:00 p.m. in Braswell's undercover automobile, a black model Z-28 Chevrolet Camaro. On the way, they stopped at a Chevron service station to look at a telephone book. Their car had a cellular telephone, but Braswell wanted the number of a pizza delivery company so that he and Althouse could order a pizza to be delivered to their apartment after the meeting with Hobbs. Braswell went inside the station, while Althouse remained in the car in the passenger seat.
While inside the service station, Braswell saw a person sitting in the driver's seat of the Camaro and pointing a gun at Althouse's head. Braswell told the store clerk to sound her alarm, as he began to run out the door. She told him that she did not have one, so Braswell turned and told her to telephone "911." As he was heading out the door, Braswell heard several shots and saw Althouse exit the car. Althouse fired his weapon at the Camaro as it sped away. Althouse died shortly thereafter from gunshot wounds.
Testimony at trial revealed that Dedrick Smith had told several persons, including Clemons, that he needed a new engine for his Camaro Z-28. On the evening of the murder, Smith, Clemons, and Kenny Reed drove to a shopping center looking for a Camaro like Smith's. Failing to find one, they proceeded onto the highway in Smith's black Camaro. Clemons spotted Braswell's Z-28 Camaro at the Chevron service station; they stopped and Clemons, carrying a gun, exited the car.
Immediately following the shooting, Clemons drove Braswell's car to the house of a friend, Herman Shannon. After examining the contents of the car and finding a shotgun and a bullet-proof vest with the word "sheriff" on it, Clemons realized that the car was a police vehicle. Clemons subsequently left town and went to his uncle's house in Ohio.
Meanwhile, the Hoover police told FBI agents, who had come to investigate Althouse's murder, that a carjacking group was operating in the West End area of Birmingham. The Birmingham police found Braswell's Camaro in West End, four blocks from Herman Shannon's house. Braswell's shotgun *Page 988 
was found on the side of the road near Clemons's house, which was also in West End.
Two days after the murder, Clemons was arrested by FBI agents in Cleveland, Ohio. He made a statement to the agents admitting that he had shot Althouse, but he claimed that he did so in self-defense in response to Althouse's drawing his gun.
At trial, the state presented evidence of three separate carjacking incidents that had occurred within the month before Althouse's death. The evidence indicated that in each of them Clemons had deprived the victims of their automobiles at gunpoint.
On this certiorari review Clemons raises 28 issues and numerous subissues, most of which were raised in, and addressed by, the Court of Criminal Appeals. The issues not presented to the Court of Criminal Appeals concerned Clemons's absence during part of the voir dire examination of one potential juror, his attempt to fire his lawyers, and the use of a photograph for in-court identification. At oral argument before this Court on this certiorari review, Clemons's counsel focused on Clemons's absence from the courtroom for most of the trial. We will discuss those issues not raised before the Court of Criminal Appeals, along with the issue of Clemons's absence during most of the trial.
Clemons was not present during part of the individual voir dire examination of one potential juror. The veniremember told the trial court that he had a matter of concern that he preferred not to discuss in front of Clemons. Clemons consented to the questioning of this veniremember in his absence. The veniremember told the court that he was concerned about his personal security and possible retaliation by Clemons's family or friends if Clemons was found guilty. The trial court explained the security measures taken for the jury in a capital case. The veniremember stated that his security concerns would not prevent him from being a fair juror. Afterwards, Clemons's attorney informed Clemons of the juror's concerns. Ultimately, the veniremember did not sit on the jury.
Clemons contends that the trial court should have told him that he had an absolute right to be present during all voir dire examination and contends that a defendant cannot waive his right to be present at any critical stage of the proceedings. The State argues that Clemons's presence during the discussion with the veniremember did not have a reasonable, substantial relation to the fullness of his opportunity to defend against the charge.
Obviously, Clemons did not object at trial as to his absence from the veniremember's examination. Therefore, this claim must be reviewed pursuant to the "plain error rule." Rule 39(k), Ala.R.App.P. Plain error is error that is so obvious that the failure to notice it would seriously affect the fairness or integrity of the proceedings. Ex parte Jackson,672 So.2d 810 (Ala. 1995).
During the voir dire examination, the veniremember in question informed the court that he had a matter he wanted to discuss with the court outside Clemons's presence. (R.T. 369.) The court acknowledged Clemons's right to be present at all stages of the trial, but gave Clemons the opportunity to discuss with counsel whether he would consent to the veniremember's request. The court was concerned that if it denied the request, then the veniremember might not tell the parties his concerns. Clemons's counsel wanted to hear what the veniremember had to say. (R.T. 370.)
The veniremember was then questioned in front of the parties, including Clemons; he stated that he had two matters to discuss with the court. He discussed the first matter with Clemons present. It concerned an incident wherein he was arrested for failing to pay a traffic citation; he explained the incident in detail for the court. The veniremember said he had forgotten to put that information on his jury questionnaire.
The veniremember was excused from the courtroom and in his absence the parties, including Clemons, discussed how they wanted to proceed with the second matter. Clemons's counsel told the court that he wanted to consult with Clemons about the veniremember's request, but also wanted the court to know that whatever the veniremember *Page 989 
disclosed to the court would be disclosed to Clemons. (R.T. 374-75.) After consulting with Clemons, Clemons's counsel told the court that Clemons consented to the veniremember's request to meet with the court and the attorneys in his absence. Clemons's counsel stated that Clemons's waiver extended only to whatever disclosure the veniremember made to the court and not to any other questioning of the veniremember on matters covered with other members of the venire. (R.T. 376-77.)
The veniremember returned to the courtroom, without Clemons present, he told the court that he was concerned about his personal security and possible retaliation by Clemons's family if Clemons was found guilty of capital murder. The court then briefly explained the security procedures involved in the trial. The court asked the veniremember whether his concerns about security would effect his ability to serve as a juror. The veniremember assured the court that his security concerns would not prevent him from being a fair juror.
A person charged with a felony has a fundamental right to be present at every stage of the trial. Illinois v.Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). That right includes the right to be present at voir dire examination of jurors and empanelling of the jury. Diaz v.United States, 223 U.S. 442, 32 S.Ct. 250, 56 L.Ed. 500
(1912). The right of presence derives from the Confrontation Clause of the Sixth Amendment to the United States Constitution and the Due Process Clauses of the Fifth andFourteenth Amendments. United States v. Gagnon, 470 U.S. 522,105 S.Ct. 1482, 84 L.Ed.2d 486 (1985).
Rule 9.1, Ala.R.Crim.P., acknowledges a defendant's right to be present at every stage of the trial, including the selection of a jury. The rule further provides that a defendant charged with a capital crime may not waive the right to be present. We note that a defendant can lose his right to be present at trial if he insists on disruptive behavior. Allen. However, the issue now before us is whether it was error for the trial court to allow the defendant to be absent during a portion of one veniremember's voir dire examination.
We must indulge every reasonable presumption against the loss of the constitutional right to be present at a critical stage in the trial. Allen, 397 U.S. at 343, 90 S.Ct. at 1060-61. However, we find no difficulty in concluding that no error occurred in Clemons's consenting to a brief absence while the veniremember discussed his security concern with the court and the attorneys. Clemons's presence during the discussion did not have a reasonably substantial relationship to the fullness of his opportunity to defend against the murder charge. Harrisv. State, 632 So.2d 503, 510 (Ala.Cr.App. 1992), aff'd,632 So.2d 543 (Ala. 1993). The veniremember was not a witness, and the matter discussed was unrelated to Clemons's guilt or innocence. Clemons was represented by counsel, and counsel subsequently informed Clemons of the veniremember's concerns. Clemons has not shown that he was prejudiced in any way by his brief absence.
We find Finney v. Zant, 709 F.2d 643 (11th Cir. 1983), to be persuasive. In Finney, the defendant was convicted of capital murder and was sentenced to death. He argued that his rights to due process and to confrontation of witnesses were violated during a short absence when he went to the restroom. During his brief absence, the State was examining a witness concerning a search. "Because the basis of the right to be present at trial is the constitutional mandate [that one be provided] an opportunity to defend oneself, due process requires that the defendant be personally present `to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.'" Finney, 709 F.2d at 646, quoting Snyder v. Massachusetts, 291 U.S. 97, 107-08,54 S.Ct. 330, 333, 78 L.Ed. 674 (1934).
The Finney court noted that there was no indication in the record that the defendant's absence was of any significance, because his attorneys were present at all times, the absence was brief, and the witness's testimony was corroborated by other witnesses who testified while the defendant was present. This present case involves a potential juror who did not sit on the jury; the matter that *Page 990 
potential juror discussed did not concern Clemons's guilt or innocence; and that matter was disclosed to Clemons. Any error resulting from Clemons's brief absence during part of the voir dire examination of a potential veniremember was harmless.
Clemons next argues that his absence during some of the guilt phase and from all of the sentencing phase rendered his conviction fundamentally unfair. Clemons's absence occurred after the State had presented five witnesses and was about to put Clemons's uncle on the stand. His uncle was to testify that Clemons had confessed to him. While the state was trying to swear in his uncle, Clemons repeatedly stated that he wanted to fire his lawyers and that he had already been convicted in a federal court of murder based on this killing. Outside the presence of the jury, the judge and Clemons had a heated debate over his behavior and over whether Clemons would cooperate during the remainder of the trial. Several times, Clemons asked that the court send him back to jail. Rather than gagging and binding Clemons, the court had him removed to a holding cell in the courthouse until he was willing to cooperate.
Clemons argues that his constitutional right to be present at every stage of the proceeding was violated by his removal. The State contends that his absence was a minor interruption. Clemons also claims that he was never allowed to return to the courtroom even though he wanted to. The State contends that Clemons was repeatedly asked if he wanted to return to the courtroom and that he adamantly answered that he did not.
The following excerpt from the trial transcript reflects what occurred in the courtroom:
 "JUDGE: Next witness?
 "PROSECUTOR: Michael Clemons. "DEFENSE COUNSEL: Excuse me, Your Honor —
 "CLEMONS: Hey, Judge —
 "PROSECUTOR: Judge, I —
 "JUDGE: Just a moment —
 "CLEMONS: I fire these lawyers, man.
 "JUDGE: Sir, just a moment, sir —
 "CLEMONS: I want the jury to know —
 "JUDGE: Sir —
 "CLEMONS: I've already been convicted —
 "JUDGE: Sir, please take your seat.
 "CLEMONS: — of these charges.
 "JUDGE: Sir, please take your seat.
 "CLEMONS: They gave me life without [sic] for these charges already in the federal court.
 "JUDGE: Take a seat. Take a seat, sir.
 "CLEMONS: Man, these lawyers are incompetent. I don't want these lawyers. I fire these lawyers.
 "JUDGE: Take a seat, sir.
 "CLEMONS: — lawyers.
 "JUDGE: Sir, if you don't take a seat I'll have to get somebody to seat you.
 "CLEMONS: I fire these lawyers. I've already been to trial —
 "JUDGE: Take a seat, sir.
 "CLEMONS: They gave me life without already —
 "JUDGE: Sir, take a seat.
 "CLEMONS: I'm sorry y'all got to go back through this, Mrs. Althouse. I'm sorry. I didn't do it.
 "JUDGE: Let me excuse the jury for just a moment.
 "CLEMONS: This ain't working, man. I already gone through the same charges already. They got life on me, man.
 "JUDGE: Sir, take a seat.
 "(Whereupon, the following proceedings were held outside the hearing and presence of the jury).
 "CLEMONS: These folks are trying to kill me, man. I don't want these lawyers. Conflict of interest, man.
 "JUDGE: Sir, we're going to do this trial in an orderly fashion. And if you can't do it in an orderly fashion then we'll have no other way of doing this other than to either [bind] and gag you or remove you from the courtroom.
 "CLEMONS: I didn't say — I don't want these lawyers representing me. And I already been tried for this and everybody knows that. I already got life without for *Page 991 
these same charges. Y'all trying to try me again and give me a death sentence. So, I already — I already been punished one time already. And me and these lawyers have a conflict of interest and I don't want these lawyers defending me. These lawyers are incompetent.
 "JUDGE: Anything else you want to say?
 "CLEMONS: I'm just letting everybody know that, the jurors and everybody. So, you going to take me back to the jail, take me back to the jail.
 "JUDGE: We're not going to have any disruption whenever the jury is in here.
 "CLEMONS: I said what I had to say.
 "DEFENSE COUNSEL: Your honor, I would like to know if Mr. Clemons would prefer to represent himself. I'll be glad to sit here at the table with him while he does his representation to assure that the evidentiary matters are covered. But —
 "JUDGE: Would you rather — prefer doing that, sir, or would you rather —
 "CLEMONS: I got to check with my folks. I got to check with my folks. I don't want these lawyers. And I already been tried for this and got life without. Y'all got me here to try to give me a death penalty for the same charges. In the federal court — y'all are trying to try me over for the same thing. That don't make no sense. Carrying Mr. and Mrs. Althouse back through this hard situation, and it hurts me to hear this same stuff over. Y'all done convicted me and another man on these same charges. Both of us got life without already. It don't make no sense, man.
 "JUDGE: Have a seat, sir.
 "CLEMONS: Y'all just take me back to the jail.
 "JUDGE: [Prosecutor,] y'all want to — "PROSECUTOR: Yes, sir, Judge. The State is going to request that if the defendant can't sit and remain silent and allow his counsel to do his job, the State is going to request that he be bound and gagged. "JUDGE: Sir, do you think you can sit in here and confer with your counsel? I don't mind you representing yourself, if that's what you want to do and have [defense counsel] as your standby counsel. "CLEMONS: I'm going to have to get me another lawyer. I ain't going to be able to represent myself. I don't — I can't represent myself. I need to get me another lawyer.
 "JUDGE: Sir, this trial is going to proceed. It's going to go on.
 "CLEMONS: You going to make me go with somebody that I don't want to defend me and it's a conflict of interest and these lawyers is incompetent?
 "JUDGE: That's what I'm not saying [sic].
 "CLEMONS: That's what you're saying? That's what you're saying to the record? "JUDGE: Sir, listen to me before you get bound and gagged. What I'm saying right now is that [defense counsel] can stand as standby counsel for you if you wish to continue this trial on your own. You can have — you can do that, you can represent yourself. But I will let [defense counsel] act as standby counsel. Or you can get your choice, they can continue to represent you.
 "CLEMONS: Send me to the jail.
 "JUDGE: Mr. Clemons, you're not doing yourself any favors by —
 "CLEMONS: I ain't trying to do no favor. You can send me back to the jail. Y'all can do what you going to try to do, send me to jail, back to jail.
 "JUDGE: Are you telling the Court you are going to continue with this disruptive atmosphere?
 "CLEMONS: I'm asking the Court to send me back to jail. I didn't want to sit in here when these folks are trying to charge me for the same thing over again.
 "JUDGE: I'm asking you, sir — I'm going to give you one final opportunity to make a response to the Court —
 "CLEMONS: That's what I'm telling you, Judge —
 "JUDGE: Are you going to stay in here and have this trial in an orderly fashion or are you going to be disruptive?
 "CLEMONS: I would like to go back to jail, Judge. *Page 992 
 "PROSECUTOR: State reiterates its request. If this defendant is not going to remain cooperative with this Court and assist his counsel, we request that he be bound and gagged so he cannot further interfere with this trial.
 "JUDGE: All right. One more time. If I don't hear any kind of response from you other than `yes' or `no' then I will go ahead and take action. Are you going to remain in here and not be disruptive? I'll give you a choice right now, either its going to be `yes' or `no.' This trial is going to continue. If I don't hear anything from you in the next few moments, I'm going to go ahead and make a decision without hearing a response from you.
 "DEFENSE COUNSEL: With regard to your decision, Your Honor, I would prefer that Mr. — that Eugene not be bound and gagged between the alternative. If the court has to do something —
 "JUDGE: That's up to Mr. Clemons. I'm not sure what he wants to do.
 "CLEMONS: What you mean by bound and gagged?
 "JUDGE: I mean, you will have a tape over your mouth, you will be in shackles.
 "CLEMONS: And you going to make me stay in this courtroom like that?
 "JUDGE: Yes.
 "CLEMONS: Forcing me in this courtroom?
 "JUDGE: Yes. I can either do that or I can remove you from the courtroom.
 "CLEMONS: That's what I'm saying. You can send me back to jail.
 "JUDGE: I can do one or the other, but I'm going to go ahead and [bind] and gag you.
 "CLEMONS: I'm going to call the state marshals in on this.
 "JUDGE: Okay. Ordering the sheriff's department to [bind] and gag this particular defendant.
 "DEFENSE COUNSEL: Your Honor, may I request of the court if something has to be done, I would prefer that Eugene not be bound and gagged. He has expressed a desire to be removed from the courtroom if something has to be done. I would prefer that Mr. Clemons sit here and help in the defense of his case, but if some alternative to that has to be followed, I would prefer that it — that Eugene have the right to waive his presence. I — and he be instructed with regard to his rights under the confrontation clauses and his right to waive those should he choose to as opposed to being — being forced to sit here bound and gagged.
 "PROSECUTOR: My current understanding of the rules is that may be permissible. But I never, for the record, have done that. "JUDGE: There is precedent under the United States Supreme Court decision to take the action that I'm about to take. I don't have a case cite. I will furnish it in a little while. The Court does have the discretion whenever you have an obstreperous defendant to go ahead and take action to either [bind] and gag or to go ahead and remove him from the courtroom.
 "And [defense counsel], your client wants to be removed from the courtroom. If you wish him to stay in here, the court will go ahead and [bind] and gag him and let him stay in here. He has not ever told the court that he wishes to stay in here in an orderly fashion and not cause any more disruptions, so I cannot — I cannot permit him to sit in here unrestricted at this point. "DEFENSE COUNSEL: I think Mr. Clemons has expressed at least from those two options, expressed which one he would prefer. If the court is compelled to do something, I, myself, would prefer that he not be bound and gagged.
 "JUDGE: Okay.
 "SECOND DEFENSE COUNSEL: I concur with [defense cocounsel].
 "JUDGE: What says the State?
 "PROSECUTOR: Whatever the defendant wishes will be satisfactory with the State.
 "JUDGE: Okay. Ordering the sheriff's department to remove the defendant from the courtroom until he can tell the Court he will not be disruptive anymore.
 "STATE: Judge, can you hold him just one second?
 "(Off-the-record discussion) *Page 993 
 "JUDGE: For the record, there is a holding cell that is in close proximity to the courtroom. We will hold the defendant there until he lets the sheriff's department — he will let me [know] that he will allow us to carry on this trial in an ordinary fashion. Okay. Sheriff's department may remove the defendant.
 "(Whereupon, the defendant was removed from the courtroom)."
(R.T. 1060-72.)
Following Clemons's removal, defense counsel moved for a mistrial based on Clemons's statements in front of the jury indicating that he had previously been convicted in a federal court for Althouse's murder. (R.T. 1077-78.) Defense counsel also stated that because of Clemons's lack of cooperation and "belligerence" toward counsel, counsel did not know if he could continue to represent Clemons. The trial court denied the motion for a mistrial and ruled that defense counsel could continue to represent Clemons in his absence. The prosecutor reminded the court that it had released two other lawyers from representing Clemons because of Clemons's inability to get along with them. (R.T. 1080.)
At the conclusion of Michael Clemons's testimony, and outside the presence of the jury, the trial court cited Illinois v.Allen, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970), for the actions a trial court could take regarding a disruptive and uncooperative defendant. The court noted that by his own conduct a defendant can lose his right to be present at trial, but that "the right to be present can be reclaimed as soon as he is willing to conduct himself consistently with decorum and respect . . . of courts and judicial procedures." (R.T. 1095.) The trial court reiterated that Clemons did not want to be bound and gagged. The court also stated that Clemons could return to the courtroom whenever he assured the court that he would behave. The court offered to give curative instructions to the jury if the parties desired.
Several times during the remainder of the trial, Clemons was asked if he wanted to return. Defense counsel was instructed to confer with Clemons and determine whether he was willing to return to the courtroom and not disturb the proceedings. (R.T. 1149-50, 1229-30, 1231-32.) The record reflects that approximately one hour after Clemons was removed from the courtroom, the bailiff asked Clemons whether he wanted to return to the courtroom and that Clemons answered, "[T]ell that Judge that I said that I have fired those attorneys and they can kiss my ass and I am not coming back up here." (R.T. 1230.)
The trial court set up a viewing room close to the courtroom; in that room Clemons could view the proceedings on a television monitor and consult with counsel during breaks. (R.T. 1231-32.) A deputy sheriff explained to Clemons that he could sit outside the courtroom and watch the trial on a monitor. (R.T. 1239-41.) Clemons declined to do so. Clemons told the deputy that he was afraid "they" were going to "jump him" and make him return to the courtroom. (R.T. 1241.) Clemons's lawyers told him that they needed him to assist in his defense.
As we stated above, every defendant has a constitutional right to be present at every stage of the proceedings against him.Illinois v. Allen. However, "a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on conducting himself in a manner so disorderly, disruptive, and disrespectful of the court that his trial cannot be carried on with him in the courtroom."Allen, 397 U.S. at 343, 90 S.Ct. at 1060-61.
 "It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations. We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant like Allen: (1) bind and gag him, *Page 994 
thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly."
Allen, 397 U.S. at 343-44, 90 S.Ct. at 1061.
Following the standards set out in Allen, this Court adopted Rule 9.2(a), Ala.R.Crim. P., which provides:
 "If a defendant engages in disruptive or disorderly conduct so that the trial or other proceeding cannot be carried on in an orderly manner, the court, after having warned the defendant of the consequences of such conduct, may, if such conduct continues, order the defendant to be bound and gagged, or otherwise restrained or removed from the trial or proceeding. If the defendant continues such disruptive or disorderly conduct after warning, he shall be deemed to have forfeited the right to be present at that trial or proceeding."
Rule 9.2(b) provides that a defendant who has been previously removed from the courtroom or has been previously restrained has the right to return to the courtroom if he assures the court that he will not again disrupt the proceedings. Rule 9.2(c) directs the trial court to provide the defendant removed from the trial with the ability "to hear, observe, or be informed of," the remaining portions of the trial.
The record reflects that the trial judge repeatedly warned Clemons that if he did not cease his disruptive behavior he would be bound and gagged or removed from the courtroom. Clemons continued to be disruptive and disorderly by telling the jury that he had already been tried in a federal court for the same crime. Clemons was apparently attempting to cause a mistrial by making such statements. Clemons ignored the trial judge's warnings and continued to be disruptive. Clemons refused to assure the trial judge that he would not disrupt the proceedings again. When the trial judge ordered that Clemons be bound and gagged, both Clemons and his trial counsel objected and asked that he be removed from the courtroom instead. Clemons was offered several opportunities to return to the courtroom, but he refused to do so. He was also provided an opportunity to view the proceedings on a television monitor and to consult with counsel during the breaks, but he refused to cooperate.
Given Clemons's refusal to stop his unruly conduct, his refusal to assure the court that he could conduct himself in an orderly manner, and his refusal to paricipate in his own trial after repeatedly being offered a chance to do so, we conclude that his constitutional right to be present at trial was not violated by his absence.
Clemons next argues that the trial court erred in allowing an in-court identification of him from a photograph; the identification was made while he was out of the courtroom, and was made by three witnesses who the State alleged had been the victims of carjackings by Clemons. Clemons's attorneys stipulated that the photograph was a photograph of Clemons. The photograph is like a "mug shot," except that in the photograph Clemons is not holding numbers.
Clemons argues that the attorneys' stipulation did not cure the constitutional problems with the photograph identification. Clemons notes that two years had passed since the carjackings involving these three witnesses. None of the three victims had identified Clemons in court before or had picked him out of a line-up before identifying the single photograph at trial. Clemons argues that exposing the victims to a single photograph at the trial, under these circumstances, created overwhelming pressure on them to make an identification and that the situation was inherently suggestive. Clemons argues that the identification procedure violated his rights to confrontation and due process because, he says, it allowed key witnesses to identify him as a criminal without having to face him.
The State argues that Clemons did not object at trial to the use of the photograph and, thus, that Clemons's argument is subject to the "plain error rule." The State contends that nothing in the record indicates that the identifications were anything but reliable. The State also contends that Clemons is now seeking relief on a claim that was "invited error" on his part, resulting from his own disruptive behavior in court. *Page 995 
This issue was not presented to the trial court or to the Court of Criminal Appeals but was first raised in this Court. Therefore, we must review it under the plain error rule.
Obviously, Clemons's trial counsel did not object to the use of the photograph; they stipulated that it was a photograph of Clemons. Clemons is not claiming here that the photograph is not a photograph of him; instead, he is arguing that the stipulation did not cure the constitutional defects he says exist in using this method of identification. Clemons cites several cases for the proposition that a pre-trial, single-photograph identification procedure has a corrupting effect on later in-court identification. See Manson v. Brathwaite,432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); Fitchard v.State, 424 So.2d 674 (Ala.Crim.App. 1982). Clemons argues that what happened in his case is more egregious than those situations where a single photograph or other suggestive material was used before trial, because in his case the single photograph was used at trial. See Neil v. Biggers,409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972); Simmons v.United States, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247
(1968); Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967,18 L.Ed.2d 1199 (1967).
"[R]eliability is the linchpin in determining the admissibility of identification testimony. . . ." Manson,432 U.S. at 114, 97 S.Ct. at 2253. Identification testimony will be suppressed only if the identification procedure was "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." Simmons,390 U.S. at 384, 88 S.Ct. at 971. This determination turns upon the totality of the circumstances in each case, considering factors that "include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation." Manson, 432 U.S. at 114,97 S.Ct. at 2253. To determine whether suppression is warranted, we must weigh the totality of the circumstances against the "corrupting effect of the suggestive identification itself." Id.
We find no plain error in the use of the photograph to identify Clemons during his absence at trial. First, the necessity for photographic identification was a direct result of Clemons's disruptive behavior in court. Second, each of the witnesses testified as to their recollection of the events surrounding the stealing of their cars at gunpoint and their opportunity to observe Clemons during the crimes. Third, before the three carjacking victims/witnesses testified, other witnesses had testified that Clemons was the one who committed the carjackings involving these three victims. Frank Blanchard testified that he was about to leave the parking lot of the Galleria shopping mall in his Ford Mustang automobile when he and his son were robbed of the car at gunpoint. (R.T. 1520-29.) Before Blanchard testified, Luke Johnson had testified that he was with Clemons the night Clemons stole a Ford Mustang from a man and a small boy at the Galleria parking lot. (R.T. 1475-80.) Jason Lipsey testified that he and his friend had their car stolen from them at gunpoint while they were at a BP service station on Green Springs Highway in Birmingham. (R.T. 1529-40.) Before Lipsey testified, Dedrick Boyd had testified that he was with Clemons when Clemons stole a car at gunpoint from two men while they were at the BP service station on Green Springs Highway. (R.T. 1493-99.) Christopher Richardson testified that his gray Ford Mustang was stolen from him at gunpoint at the Crown service station in Forestdale. (R.T. 1541-49.) Dedrick Boyd had testified earlier that he was with Clemons when Clemons stole a gray Ford Mustang from a service station in Forestdale. (R.T. 1503-07.)
Last, Clemons argues that the trial court erred in not discussing with him his right to defend himself. At the time when Clemons stated that he wanted to fire his lawyers, one of his attorneys stated that Clemons could represent himself and that he would act as standby counsel. The trial court then asked Clemons if he wanted to represent himself. Clemons replied by stating that he would have to check with his *Page 996 
family, and he continued to state that it was unfair to try him in the state court when he had already been tried in a federal court. The trial court again asked Clemons if he could sit in the courtroom and not be disruptive. The trial court also told Clemons that he could represent himself and have his attorney act as standby counsel. Clemons told the court that he would not be able to represent himself and that he wanted a new lawyer. The trial court then gave Clemons another chance to represent himself or to proceed to trial with his current attorneys. Clemons responded, "Send me to the jail."
Clemons argues that he was never informed of his absolute right to defend himself. He also contends that the trial court failed to fully inform him of the meaning of "standby counsel." The State contends that Clemons clearly indicated that he did not want to represent himself and that only if he had indicated a desire to represent himself would the court have been required to engage Clemons further on that matter.
This issue was not presented at trial; therefore, this Court's review is pursuant to the plain error rule. If a defendant voluntarily and intelligently chooses to waive his right to counsel, he should be informed by the court of the dangers and disadvantages of representing himself, so that the record will reflect that he knows what he is doing and that he is making his choice with his eyes open. Faretta v. California,422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).
It is clear from the record that Clemons had no difficulty understanding the concept of representing himself. He clearly stated that he did not want to represent himself. In fact, Clemons never asked that he be allowed to represent himself. When the trial court presented him the offer to represent himself, Clemons declined. Following Clemons's rejection of that offer, it was unnecessary for the trial court to further discuss with him his right to represent himself.
The judgment of the Court of Criminal Appeals is affirmed.
AFFIRMED.
HOOPER, C.J., and MADDOX, SHORES, HOUSTON, COOK, BUTTS and SEE, JJ., concur.
[1] Clemons was convicted in a federal court of murdering a federal agent who was engaged in the performance of his duties and of carrying and using a firearm in the commission of a crime of violence. United States v. Clemons, 32 F.3d 1504
(11th Cir. 1994).