791 So.2d 409 (2000)
LaSamuel GAMBLE
v.
STATE.
CR-97-0698.
Court of Criminal Appeals of Alabama.
February 4, 2000.
Opinion on Return to Remand June 30, 2000.
Rehearing Denied August 18, 2000.
Certiorari Denied March 2, 2001.
*415 Irvin Harry Lyon, Pelham; and Joe W. Morgan, Jr., Birmingham, for appellant.
Bill Pryor, atty. gen., and A. Vernon Barnett IV, asst. atty. gen., for appellee.
Alabama Supreme Court 1992229.
LONG, Presiding Judge.
The appellant, LaSamuel Gamble, was convicted of two counts of capital murder in connection with the killings of John Burleson and Janice Littleton. The murders were made capital because they were committed during the course of a robbery in the first degree. See § 13A-5-40(a)(2), Ala.Code 1975. The jury recommended, by a vote of 10-2, that Gamble be sentenced to death for his convictions. The trial court accepted the jury's recommendation and sentenced Gamble to death by electrocution.
The State's evidence tended to show the following. On July 25, 1996, Gamble and his accomplices, Marcus Presley[1] and Steven *416 McKenzie,[2] robbed "John's 280 Pawn," a pawnshop on Highway 280 in Shelby County. During the robbery, Presley killed John Burleson, the owner of the pawnshop, and Janice Littleton, an employee of the pawnshop, by shooting them in the head. A surveillance camera inside the pawnshop captured the entire robbery on videotape, including Gamble's participation in the robbery and the murders and Presley's shooting of Burleson and Littleton.[3] Events depicted on the videotape revealed that approximately 30 minutes before the robbery, Presley entered the pawnshop, looked around, and asked Burleson about some merchandise in the store. Presley left, and at approximately 3:20 p.m., he returned, this time accompanied by Gamble (McKenzie did not come inside the pawnshop during the robbery, but waited outside in the car). Both men were armed with handguns. Gamble and Presley forced Burleson and Littleton to lie down on the floor behind the counter while they spent approximately 30 minutes going through the pawnshop, taking jewelry, guns, and cash from the cash register. Before leaving the store, Presley approached Burleson and Littleton, who were still lying on the floor; he leaned over the counter, and fired one shot. The videotape showed that after Presley fired the shot, his gun jammed. While he was trying to unjam his gun, Presley turned and motioned to Gamble, who was standing just outside the front door. Gamble walked to where Presley was standing, and then returned to the front door. Presley fired his gun at the victims a second time; his gun again jammed. At that point, Gamble began picking up unspent bullets that had fallen out of Presley's gun when Presley was trying to unjam it. Presley fired one more shot at the victims. The videotape showed that Gamble then leaned over the counter and looked at the victims on the floor. The two men then quickly left the pawnshop.
Testimony revealed that Presley shot Burleson twice in the head and Littleton once in the head. Burleson was dead when the police arrived at the pawnshop. Littleton was still alive when the police arrived, but she died later that day at the hospital from the gunshot wound.
The day following the robbery-murders, Gamble and his accomplices traveled by bus to Boston, Massachusetts, where they remained for approximately one week. McKenzie was arrested in Boston on August 1, 1996. Information given to police by McKenzie led to the arrests of Gamble and Presley on August 9, 1996, in Norfolk, Virginia. Both Gamble and Presley gave statements to police officers in Virginia before they were returned to Alabama. On August 19, 1996, Gamble and Presley gave second statements to investigators with the Shelby County, Alabama, Sheriff's Office. Items identified as being stolen from the pawnshop were found in the possession of McKenzie, Gamble, and Presley after their arrests. Some of the items stolen from the pawnshop were also found in Gamble's mother's house in Birmingham.
On appeal from his convictions, Gamble raises numerous issues, many of *417 which he did not raise by objection in the trial court. Because Gamble was sentenced to death, his failure to object at trial does not bar our review of these issues; however, it does weigh against any claim of prejudice Gamble now makes on appeal. See Dill v. State, 600 So.2d 343 (Ala.Cr.App.1991), aff'd, 600 So.2d 372 (Ala.1992), cert. denied, 507 U.S. 924, 113 S.Ct. 1293, 122 L.Ed.2d 684 (1993); Kuenzel v. State, 577 So.2d 474 (Ala.Cr.App. 1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991).
Rule 45A, Ala.R.App.P., provides:
"In all cases in which the death penalty has been imposed, the Court of Criminal Appeals shall notice any plain error or defect in the proceedings under review, whether or not brought to the attention of the trial court, and take appropriate appellate action by reason thereof, whenever such error has or probably has adversely affected the substantial right of the appellant."
This court has recognized that "`the plain-error exception to the contemporaneous-objection rule is to be "used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result."'" Burton v. State, 651 So.2d 641, 645 (Ala.Cr.App.1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995), quoting United States v. Young, 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982)). Accordingly, we will address the issues raised by Gamble on appeal.

I.
Gamble contends that he was denied his Sixth Amendment right to counsel because a lawyer was not appointed to represent him "from the moment of his arrest in Virginia." (Gamble's brief to this court, p. 73.) Gamble did not present this claim to the trial court; therefore, we will review it pursuant to the plain-error rule. Rule 45A, Ala.R.App.P. This claim is meritless.
In Gilchrist v. State, 585 So.2d 165 (Ala.Cr.App.1991), we said:
"Decisions by the United States Supreme Court `have long recognized that the [Sixth Amendment] right to counsel attaches only at or after the initiation of adversary judicial proceedings against the defendant.' United States v. Gouveia, 467 U.S. 180, 187, 104 S.Ct. 2292, 2297, 81 L.Ed.2d 146 (1984). `By its very terms, [the Sixth Amendment] becomes applicable only when the government's role shifts from investigation to accusation.' Moran v. Burbine, 475 U.S. 412, 430, 106 S.Ct. 1135, 1146, 89 L.Ed.2d 410 (1986). `[T]he Sixth Amendment right to counsel does not attach until after the initiation of formal charges.' Moran, 475 U.S. at 431, 106 S.Ct. at 1146. The Supreme Court has recognized that, depending on the jurisdiction, the initiation of formal charges may occur at the preliminary hearing, indictment, information, or arraignment. Kirby v. Illinois, 406 U.S. 682, 689, 92 S.Ct. 1877, 1882, 32 L.Ed.2d 411 (1972)."
585 So.2d at 168. "Alabama statutes provide that counsel be appointed prior to arraignment if it is shown that the defendant does not have counsel and is indigent." Goodson v. State, 588 So.2d 509, 513 (Ala.Cr.App.1991).
The record reflects that Gamble was arrested in Virginia on August 9, 1996, and was indicted that same day by the Shelby County, Alabama, grand jury. On August 14, 1996, an arrest warrant was issued for Gamble in Shelby County for the murders of Burleson and Littleton. Gamble was extradited from Virginia to Alabama on *418 August 18, 1996. On August 20, 1996, during his initial appearance before the trial court, Gamble informed the court that he wished to retain counsel. The trial court gave Gamble until September 6, 1996, to retain counsel and said that in the event that he had not done so by September 6, it would appoint counsel to represent him. When Gamble failed to retain counsel, the trial court found Gamble to be indigent and appointed counsel for him on September 9, 1996. Gamble was not arraigned until October 3, 1996, approximately one month after counsel was appointed.
Gamble was properly appointed counsel before his arraignment. He was not, as he claims on appeal, entitled to appointed counsel at the time of his arrest. Moreover, there is no indication in the record that Gamble ever requested counsel when he was arrested or when he gave statements to the police. Thus, we find no error, plain or otherwise, here. See Goodson, supra; see also Guenther v. State, 282 Ala. 620, 624-25, 213 So.2d 679 (1968), cert. denied, 393 U.S. 1107, 89 S.Ct. 916, 21 L.Ed.2d 803 (1969) (wherein court declined to extend right to counsel to attach at the "moment [the defendant] is arrested").

II.
Gamble contends that the trial court erred in denying his motion to continue the hearing on his application for youthful offender status. He appears to argue that the continuance should have been granted because, he says, the State had not "provided discovery" and that the State "may have had discoverable evidence in the form of statements of others that could have had an impact on his testimony at the Youthful Offender Hearing, and which may have affected the trial." (Gamble's brief to this court, p. 65.) We find no merit to this claim.
"The trial court has discretion in determining whether or not to grant a continuance. This Court will not reverse the trial court's decision in regard to a continuance absent a showing of gross abuse of the trial court's discretion." Malone v. State, 659 So.2d 1006, 1011 (Ala.Cr. App.1995) (citations omitted). "`The reversal of a conviction because of the refusal of the trial judge to grant a continuance requires "a positive demonstration of abuse of judicial discretion." Clayton v. State, 45 Ala.App. 127, 129, 226 So.2d 671, 672 (1969).' Beauregard v. State, 372 So.2d 37, 43 (Ala.Cr.App.), cert. denied, Ex parte Beauregard, 372 So.2d 44 (Ala. 1979)." Connor v. State, 447 So.2d 860, 863 (Ala.Cr.App.1984).
The record reflects that the trial court granted Gamble's first request to continue the youthful offender hearing from December 13, 1996, to December 20, 1996. The case action summary sheet reveals that the trial court denied his second request, filed the day before the scheduled December 20 hearing; however, there is nothing in the record to indicate the reasons for the denial, and the hearing on the application for youthful offender status is not contained in the record on appeal. Initially, we note that "[w]here the appellant fails to include pertinent portions of the proceeding in the record on appeal, this court may not presume a fact not shown by the record and make it a ground for reversal." Carden v. State, 621 So.2d 342, 345 (Ala.Cr.App.1992). It is the appellant's duty to provide this court with a complete record on appeal, and we will not predicate error on a silent record. See Wilson v. State, 727 So.2d 869 (Ala.Cr.App. 1998).
Notwithstanding the above, it appears from our reading of the motion for a continuance that Gamble was requesting *419 the continuance on the ground that the State had allegedly not provided him with a copy of the videotape of the crime recorded by the pawnshop's surveillance camera. However, Gamble has not shown, either in his motion for a continuance or on appeal, that he was prejudiced as a result of his not having the videotape before the hearing. Instead, he only speculates on appeal that the State "may have had discoverable evidence in the form of statements of others that could have had an impact on his testimony at the Youthful Offender Hearing, and [that] could have affected the trial." (Gamble's brief to this court, p. 65; emphasis added.) There is no mention in Gamble's appellate brief of the surveillance videotape that was the basis for his second continuance motion at trial. Thus, we find no showing by Gamble that the trial court abused its discretion in denying his motion for a continuance.
Gamble also contends that the trial court erred in denying his application for youthful offender status. Specifically, he argues that "his was an unremarkable case, save for the robbery and murder that was the nature of the instant charge" and that "the only basis to refuse Youthful Offender treatment was the nature of the charge." (Gamble's brief to this court, p. 70.) We find no merit to this claim.
As we stated in Hyde v. State, 778 So.2d 199 (Ala.Cr.App.1998):
"The trial court has almost absolute discretion in deciding whether to grant or to deny a defendant treatment as a youthful offender, and that decision will not be overturned absent an affirmative showing that the decision was arbitrary or was made without some investigation or examination of the defendant. Burks v. State, 600 So.2d 374 (Ala.Cr.App. 1991); Barnett v. State, 348 So.2d 512 (Ala.Cr.App.), cert. denied, 351 So.2d 571 (Ala.1977). The trial court is not required to turn each case over to a probation officer for an investigation and is not required to conduct a formal hearing in every case. Burks, supra; Arrington v. State, 513 So.2d 40 (Ala.Cr. App.1987). All that is required is that the trial court undertake an examination of the defendant sufficient to enable it to make an intelligent determination as to whether, in its discretion, the defendant is eligible for treatment as a youthful offender. Fields v. State, 644 So.2d 1322 (Ala.Cr.App.1994).... Because the facts of this case are extremely serious, the trial court did not abuse its discretion in denying the appellant's request for treatment as a youthful offender. Barnett, supra. Even though the appellant did not have a significant criminal record, the trial court's decision is justified based upon the circumstances of the case and the offense charged."
778 So.2d at 224-25. Further, the trial court is not required to state on the record its reasons for denying an application for youthful offender status. Arrington v. State, 513 So.2d 40, 41-42 (Ala.Cr.App. 1987).
Although, as we noted previously, there is no transcript of the hearing on Gamble's application for treatment as a youthful offender, an entry on the case action summary sheet, as well as the application itself, indicates that the trial court ordered an investigation of Gamble's application by the Shelby County Parole and Probation Office, pursuant to §§ 15-19-1 through 15-19-7, Ala.Code 1975. "Where it does not affirmatively appear that the trial court's decision was arbitrary or that it was made without any examination or investigation, there is no basis for overturning the trial court's decision." Carden v. State, 621 So.2d 342, 345 (Ala.Cr.App. 1992). Further, as we previously said, *420 "[w]here the appellant fails to include pertinent portions of the proceedings in the record on appeal, this court may not presume a fact not shown by the record and make it a ground for reversal." Carden, 621 So.2d at 345. It is the appellant's duty to provide this court with a complete record on appeal, and we will not predicate error on a silent record. See Wilson v. State, 727 So.2d 869 (Ala.Cr.App.1998). "`Where the record is silent on appeal, it will be presumed that what ought to have been done was not only done, but rightly done.'" Jordan v. City of Huntsville, 667 So.2d 153, 156 (Ala.Cr.App.1995), quoting Stegall v. State, 628 So.2d 1006, 1009 (Ala. Cr.App.1993).
Gamble has failed to show that the trial court abused its discretion in denying his application for youthful offender treatment. As we stated in Miller v. State, 650 So.2d 940 (Ala.Cr.App.1993), rev'd on other grounds, 650 So.2d 947 (Ala. 1994), "`the nature of the fact situation on which the charge is based may be a sufficient reason for denying youthful offender status.'" 650 So.2d at 945, quoting Ex parte Farrell, 591 So.2d 444, 449 (Ala.1991) (emphasis in Farrell). "Moreover, where the record does not support the contention that youthful offender status was denied solely on the basis of the crime charged, this court will not reverse the trial court's decision to deny youthful offender status." Miller, 650 So.2d at 945. There is nothing in the record to support Gamble's contention that he was improperly denied youthful offender treatment solely on the basis of the crime he was charged with, and there is nothing in the record to indicate that the trial court's decision was arbitrary or was an abuse of discretion. Thus, we find no error here.

III.
Gamble contends that the trial court erred when it "limited the psychiatric examination [of him] to an abbreviated procedure." (Gamble's brief to this court, p. 68.) He acknowledges in his brief to this court that a mental examination was conducted, but nonetheless argues that the "abbreviated form was not adequate to fully evaluate his mental functioning." (Gamble's brief to this court, p. 68.)
The record reveals that on January 6, 1996, the trial court ordered that Gamble be examined at Taylor Hardin Secure Medical Facility to determine his competency to stand trial and his mental state at the time of the offense. On March 12, 1996, the State filed a motion to amend the trial court's order that he undergo a mental examination to reflect an outpatient examination as opposed to an inpatient examination (the trial court's order did not specify which type of evaluation was to be conducted). In support of the motion to amend, the State informed the trial court that Beverly Strong, the director at Taylor Hardin, had indicated to the district attorney's office that it would be several months before she could schedule Gamble for an inpatient examination, but she could schedule Gamble "almost immediately" for an outpatient examination. In its motion to amend, the State conditioned its request for an outpatient examination, stating that it wanted this type of examination only "as long as the Director believe[d] that an adequate examination could be performed on such a basis." (C. 93.)
On April 11, 1996, the trial court issued an amendment to its January 6 order for a mental examination of Gamble, in which it said the following:
"On March 12, 1997 the State filed a Motion to Amend Original Order for Examination. Defendant objected to said motion. On April 19, 1997 this Court heard argument relative to said motion from the State and from Defendant, *421 by and through his counsel. After having heard argument, Defendant's objection is overruled. The State's motion is GRANTED. Accordingly, it is ORDERED by the Court that this Court's order for Examination of the Defendant entered January 6, 1997 is hereby amended to provide that Taylor Hardin Secure Medical Facility shall be allowed to perform an examination on the Defendant on an `outpatient' basis as long as the Director and/or Certified Forensic Examiner believes that said examination is sufficient to comply with what is sought by the Court under its January 6, 1997 Order. However, after having conducted an `outpatient' examination, should the Director and/or Certified Forensic Examiner be of the opinion an `inpatient' examination is needed, then said `inpatient' examination shall be conducted."
(C. 96.)
Although the trial court's amended order reflects that Gamble objected to the State's request to have him evaluated on an outpatient basis, there is no transcript of the hearing on the State's request, much less the grounds for Gamble's objection. It is the appellant's duty to file a complete record on appeal. Wilkerson v. State, 686 So.2d 1266 (Ala.Cr.App.1996). We will not predicate error on a silent record. Foster v. State, 587 So.2d 1106 (Ala.Cr.App.1991). "`Where the record is silent on appeal, it will be presumed that what ought to have been done was not only done, but rightly done.'" Jordan v. City of Huntsville, 667 So.2d at 156, quoting Stegall v. State, 628 So.2d 1006, 1009 (Ala.Cr.App.1993). Moreover, the forensic evaluation report prepared by doctors at Taylor-Hardin, following their examination of Gamble, revealed that they found him to be competent to stand trial and that he was not suffering from any mental disorder at the time of the offense that would prevent him from understanding right from wrong.
Notwithstanding the above, we note that Gamble has offered nothing on appeal to show how he was prejudiced as a result of the mental examination being performed on an outpatient basis. He does not even allege that he was suffering from a mental disease or defect at the time of the offense, or that he was suffering from a mental disorder that would impair his competency to stand trial. Further, the record reflects no other hearings or discussions concerning Gamble's mental evaluation and the results of that evaluation, much less that the outpatient examination was inadequate to properly evaluate his mental state.
Rule 11.3(a), Ala.R.Crim.P., provides, in pertinent part, that "[e]valuations ordered to be performed by a psychiatrist or psychologist under contract with or employed by the Department of Mental Health and Mental Retardation shall be performed on an outpatient basis where feasible, and where necessary, the sheriff of the county in which criminal charges are pending shall be responsible for the custody, care, and transportation of the defendant during the outpatient visit." (Emphasis added.) Rule 11.3(b)(1-3) further provides for the commitment of a defendant for examination only when the defendant cannot be examined on an outpatient basis, when an examination in an outpatient setting is unavailable, or when the appointed examiner reports that confinement for evaluation is indispensable to a clinically valid diagnosis and report. Here, none of those circumstances existed. It appears from the record that Gamble's competency to stand trial and his mental state at the time of the crime were never an issue at trial. Gamble has failed to show that he was prejudiced as a result of the manner in which his mental evaluation was conducted. Because Gamble has failed to present this *422 court with any evidence to substantiate his contention, we find no error, plain or otherwise, as to this claim.

IV.
Gamble contends that his constitutional rights were violated when, in his absence, the trial court conducted a pretrial conference that, he says, was a "critical point in the trial process." (Gamble's brief to this court, pp. 36-37.) Citing Rule 9.1, Ala.R.Crim.P.,[4] Gamble argues that he had a constitutional right to be present during all phases of the trial. Because this claim was not presented to the trial court at the time of the pretrial conference from which Gamble was absent, but rather was presented in a motion filed approximately one month after the pretrial conference, we will review it pursuant to the plain-error rule. Rule 45A, Ala.R.App.P. We find no error, much less plain error, as to this claim.
The record reveals that on October 21, 1997, the trial court held a pretrial conference at which Gamble was not present; the conference was not transcribed. On November 17, 1997, just before jury selection, Gamble's trial counsel, in arguing his motion to exclude the capital-murder charge, claimed that "some very substantive issues" regarding Gamble's alleged prior bad acts had been detailed by the prosecutor during the pretrial conference. Gamble's counsel stated to the trial court that, after the pretrial conference, the prosecutor mailed him a copy of a list of the five prior bad acts involving Gamble that had been discussed at the pretrial conference. In response, the trial court said:
"But now during that hearing or at least the part that I was involved in, there was not any detailed conversations of these five acts or this list. In fact, the first time I have seen this list is attached to your motion. That list was not produced in court.
"That was produced between counsel after that hearing."
(R. 15.) The prosecutor then stated for the record that he did not recall any formal pretrial hearing from which Gamble had been absent. He further stated that there was a meeting with the trial judge where dates were set for certain trial matters and where sequestration of the jury was discussed. The trial court then stated:
"My recollection is similar in that we did discuss scheduling issues. And when I say scheduling, included in that was sequestration issues. And at that time, I think I even made the defense counsel aware that at any point if they wishedgave the defense counsel an opportunity to make a decision as to whether or not they wished to have a jury sequestered and their initial response was they did not at least until the deliberation process. But if they change their mind, they had an opportunity to make the Court aware of that. That is the most substantive issue, if you call that substantive, that we discussed.
"I do recall some discussions between the state and the defendant that there was some other discovery issues they needed to accomplish, but I do not recall anycertainly I didn't knownever seen this list before. It was not produced during that hearing."
(R. 21-22.) The trial court further stated that the decision whether to sequester the jury was not decided at the pretrial conference, *423 and in fact had not yet been made. (R. 25.) The trial court then denied Gamble's motion to exclude the capital-murder charge.
In Borden v. State, 769 So.2d 935 (Ala. Cr.App.1997), we said:
"`"The court in Proffitt v. Wainwright, [685 F.2d 1227 (11th Cir.1982), cert. denied, 464 U.S. 1002, 104 S.Ct. 508, 78 L.Ed.2d 697 (1983)], acknowledged in a footnote that in Snyder v. Massachusetts, 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934), `which was a capital case, [the Court] stated that the sixth amendment privilege of confrontation could "be lost by consent or at times even by misconduct." Snyder v. Massachusetts, 291 U.S. at 106, 54 S.Ct. at 332.' Proffitt v. Wainwright, supra, at 1257, n. 43. See also State v. Davis, 290 N.C. 511, 227 S.E.2d 97, 110 (1976) (`[t]he strict rule that an accused cannot waive his right to be present at every stage of his trial upon an indictment charging a capital felony, State v. Moore, 275 N.C. 198, 166 S.E.2d 652 (1969), is not extended to require his presence at the hearing of a pretrial motion for discovery when he is represented by counsel who consented to his absence, and when no prejudice resulted from his absence'). See also State v. Piland, 58 N.C.App. 95, 293 S.E.2d 278 (1982), appeal dismissed, 306 N.C. 562, 294 S.E.2d 374 (1982) (`[t]he [capital] defendant in this case has not demonstrated any prejudice to him by his absence from a part of the hearing. The evidence elicited was not disputed and there has been no showing that it would have been different had the defendant been present').
"`"Thus, if the appellant's presence... would have been useless to [his] defense and if the [pre-trial] hearing was not considered to be a `critical stage' of [his] trial, then we can find no error in the appellant's absence from the hearing."'
"[Ponder v. State], 688 So.2d [280,] at 285 [(Ala.Cr.App.1996)], quoting Harris v. State, 632 So.2d 503, 512 (Ala.Cr.App. 1992), aff'd, 632 So.2d 543 (Ala.1993), aff'd, 513 U.S. 504, 115 S.Ct. 1031, 130 L.Ed.2d 1004 (1995) (emphasis [omitted]). See also Dobyne v. State, 672 So.2d 1319 (Ala.Cr.App.), on return to remand, 672 So.2d 1353 (Ala.Cr.App. 1994), aff'd, 672 So.2d 1354 (Ala.1995), cert. denied, 517 U.S. 1169, 116 S.Ct. 1571, 134 L.Ed.2d 670 (1996); Ex parte DeBruce, 651 So.2d 624 (Ala.1994); Burton v. State, 651 So.2d 641 (Ala.Cr.App. 1993), aff'd, 651 So.2d 659 (Ala.1994), cert. denied, 514 U.S. 1115, 115 S.Ct. 1973, 131 L.Ed.2d 862 (1995)."
769 So.2d at 943; see also Burgess v. State, 723 So.2d 742 (Ala.Cr.App.1997), aff'd, 723 So.2d 770 (Ala.1998), cert. denied, U.S., 526 U.S. 1052, 119 S.Ct. 1360, 143 L.Ed.2d 521 (1999).
Clearly, Gamble has not demonstrated that he suffered any prejudice as a result of his absence from the informal pretrial conference. The pretrial conference was not a "critical" stage of the trial. Thus, we find no error, plain or otherwise, as to this claim.

V.
Gamble contends that the State improperly used one of its peremptory strikes to remove a black prospective juror from the venire, in violation of the principles of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The record reveals that upon completion of the voir dire, and after challenges for cause had been granted, two black prospective jurors remained on the venire. After the jury was struck, Gamble's counsel presented a *424 Batson motion challenging the State's striking of the two remaining black jurors, R.H. and E.T. In support of his motion, counsel relied solely on the number of blacks struck. The trial court found a prima facie case of racial discrimination on the number of strikes alone, and ordered the prosecutor to state his reasons for the two strikes. After hearing those reasons, the trial court denied Gamble's Batson motion.
On appeal, Gamble does not challenge the prosecutor's striking of R.H., conceding that that strike was proper;[5] however, Gamble does challenge the prosecutor's striking of E.T., arguing only that E.T. "stated that she could serve." (Gamble's brief to this court, p. 54.) In explaining his striking of Juror E.T., the prosecutor said:
"[The prosecutor]: As to E.T., she fell into a category with one other individual by the name of Mr. W., Mr. S.W. Mr. W had several bad checks that came through our office as well that we prosecuted him on and we struck him as well as E.T. E.T. has a lengthy, lengthy history with our office as far as bad checks.
"I have gone to our worthless check unit and pulled out both of her files. And for the record, Judge, it might take me a minute. I would like to put the dates and numbers of checks that she had been associated with our office on.
"The Court: Is this information that was made available to the defense counsel?
"[The prosecutor]: Yes, sir, it is."
(R. 937-38.) The prosecutor then provided the trial court with a list of approximately 20 bad checks written by E.T. from January 1992 to September 1997. (R. 938.) The prosecutor stated that charges relating to five of those bad checks were currently pending in his office. The prosecutor further stated that his office had prosecuted E.T. numerous times for worthless checks and had put her in jail on each occasion. The prosecutor also informed the trial court that his office had prosecuted E.T. for possession of marijuana and had obtained a conviction on that charge. (R. 941-45.)
Striking a juror with a criminal history is a valid race-neutral reason for a peremptory challenge. See Ex parte McNair, 653 So.2d 353, 356 (Ala.1994), cert. denied, 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995). "The fact that `[a veniremember] or a relative of his had been either charged with, prosecuted for, or convicted of a crime' has been held to be a race-neutral reason." Gorum v. State, 671 So.2d 764, 766 (Ala.Cr.App. 1995), quoting Scott v. State, 599 So.2d 1222, 1228 (Ala.Cr.App.), cert. denied, 599 So.2d 1229 (Ala.1992), overruled on other grounds, Smith v. State, 612 So.2d 1314, 1316 (Ala.Cr.App.1992) (brackets in Gorum); see also Bryant v. State, 516 So.2d 938, 941 (Ala.Cr.App.1987) (challenge to prospective juror on ground that juror had written bad checks in the past was raceneutral *425 reason). Clearly, the State articulated race-neutral reasons for eliminating Juror E.T., and we find no error in the trial court's denial of Gamble's Batson motion.

VI.
Gamble contends that he was denied the right to be tried by a jury of his peers because no blacks served on his jury. He also contends that his constitutional rights were violated because, he claims, blacks were underrepresented on his venire. The trial court properly denied Gamble's challenge to the venire and to the jury on these grounds.
"`In order to establish a prima facie violation of the fair cross-section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process.'"
Ex parte Land, 678 So.2d 224, 244 (Ala.), cert. denied, 519 U.S. 933, 117 S.Ct. 308, 136 L.Ed.2d 224 (1996), quoting Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664, 668-69, 58 L.Ed.2d 579 (1979). Although Gamble has satisfied the first prong of the Duren testi.e., blacks are a "distinctive" group in the communityhe has failed to satisfy the remaining two prongs of Duren.
As to the second Duren prong, Gamble merely states that there were only two blacks on the jury venire (one other black veniremember was excused prior to voir dire for medical reasons), that he was convicted by an all-white jury, and that, therefore, his conviction should be reversed because blacks were underrepresented on his jury venire. (Gamble's brief to this court, p. 55.) As he did at trial, Gamble has offered nothing on appeal other than the number of blacks on the venire to support his challenge to the composition of the venire. He has failed to provide either the trial court or this court with any evidence as to the percentage of blacks in Shelby County as compared to the percentage of blacks on his venire. Although no blacks ultimately sat on his petit jury, "it is the source from which the venire is selected that must be fairly representative of the community, rather than the jury actually chosen." Travis v. State, 776 So.2d 819, 838 (Ala.Cr.App.1997).
As to the third prong of Durenthat the underrepresentation on the defendant's jury venire is due to systematic exclusion of the group in the jury selection processGamble makes no cognizable argument. The record reveals that the method of selecting Gamble's venire was random selection from a list of licensed drivers in Shelby County. (R. 924.) "`"Random selection from a list of licensed drivers has been held to be an acceptable manner in which to select a jury."'" Travis, 776 So.2d at 836, quoting Stanton v. State, 648 So.2d 638, 641 (Ala. Cr.App.1994); see also Clemons v. State, 720 So.2d 961, 972 (Ala.Cr.App.1996), aff'd, 720 So.2d 985 (Ala.1998), cert. denied, 525 U.S. 1124, 119 S.Ct. 907, 142 L.Ed.2d 906 (1999).
"`"The third Duren ... element that there has been a systematic exclusion of a distinctive groupconstrains a defendant to establish that `the cause of the underrepresentation was ... inherent in the particular jury-selection process utilized.' Duren, 439 U.S. at 366, 99 S.Ct. at 669." Sistrunk v. State, 630 So.2d [147, 149 (Ala.Cr.App.1993)]. Additionally, "with regard to the second *426 and third Duren elements, a defendant asserting a fair cross-section violation `must demonstrate ... not only that [blacks] were not adequately represented on his jury venire, but also that this was the general practice in other venires.' Timmel v. Phillips, 799 F.2d 1083, 1086 (5th Cir.1986)." Sistrunk v. State, 630 So.2d at 150. In this case, there was absolutely no showing either that random computerized selection of licensed drivers inherently results in underrepresentation of blacks on jury venires in [Shelby] County or that blacks had been underrepresented on other venires in [Shelby] County.'"
Travis, 776 So.2d at 838. Accordingly, we find no error as to this issue.

VII.
Gamble contends that it was "unconstitutional" to allow the State to "death-qualify" the veniremembers. Although he concedes that the law is contrary to his contention, Gamble nonetheless argues that death-qualification of the venire is unconstitutional because, he says, the "personal and political points of view of the jurors are not subject to question." (Gamble's brief to this court, p. 73.) This issue is presented for the first time on appeal; therefore, we will review it pursuant to the plain-error rule. Rule 45A, Ala.R.App.P. There is no merit to Gamble's claim that death-qualifying a jury is unconstitutional.
"[T]he State may properly ask the veniremembers questions pursuant to Witherspoon v. Illinois, [391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968)], and Wainwright v. Witt, [469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)]. The United States Supreme Court resolved this issue in Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986), holding that the Constitution does not bar the States from `deathqualifying' juries in capital cases, and that death-qualifying a jury does not deprive a defendant of a fair and impartial jury, and Alabama courts have consistently held likewise. Clemons v. State, [720 So.2d 961 (Ala.Cr.App.1996), aff'd, 720 So.2d 985 (Ala.1998), cert. denied, U.S., 525 U.S. 1124, 119 S.Ct. 907, 142 L.Ed.2d 906 (1999)]; Williams v. State, [710 So.2d 1276, 1318 (Ala.Cr.App. 1996), aff'd, 710 So.2d 1350 (Ala.1997)]; Sockwell v. State, 675 So.2d 4 (Ala.Cr. App.1993), aff'd, 675 So.2d 38 (Ala.1995), cert. denied, 519 U.S. 838, 117 S.Ct. 115, 136 L.Ed.2d 67 (1996); Haney v. State, 603 So.2d 368, 391-92 (Ala.Cr.App.1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); Williams v. State, 556 So.2d 737 (Ala.Cr.App.1986), rev'd in part, 556 So.2d 744 (Ala.1987); Edwards v. State, 515 So.2d 86, 88 (Ala.Crim.App. 1987); Martin v. State, 494 So.2d 749 (Ala.Crim.App.1985); Clark v. State, 451 So.2d 368 (Ala.Cr.App.1984); Taylor v. State, 442 So.2d 128 (Ala.Cr.App.1983); McGinnis v. State, 382 So.2d 605 (Ala. Cr.App.1979), cert. denied, 382 So.2d 609 (Ala.1980)."
Travis, supra at 871; see also Davis v. State, 718 So.2d 1148 (Ala.Cr.App.1995), aff'd, 718 So.2d 1166 (Ala.1998), cert. denied, 525 U.S. 1179, 119 S.Ct. 1117, 143 L.Ed.2d 112 (1999). Accordingly, we find no error as to this claim.

VIII.
Gamble contends that the trial court erred in denying his motion to suppress his statement made to investigators with the Shelby County Sheriffs Office. Specifically, he argues that his statement was involuntary because, he says, he had clearly and unequivocally invoked his right to remain silent. The following portion of *427 Gamble's statement to police forms the basis of his claim:
"Mr. Yawn [interrogating officer]: Mr. Gamble?
"Mr. Gamble: Uh-huh.
"Mr. Yawn: We know that in anything there are at least two sides to every story, okay?
"Mr. Gamble: Uh-huh.
"Mr. Yawn: We want to give you the opportunity to tell your side, okay? Um.
"Mr. Gamble: I thought y'all already knew my side.
"Mr. Yawn: No, sir, we don't, not completely. So we just want to give you the opportunity to tell us directly.
"Mr. Gamble: I already told my side of the story [to Virginia law enforcement officials]. I don'tI don't want to go through all this again.
"Mr. Yawn: Okay.
"Mr. Gamble: I alreadyI already said what I had to say.
"Mr. Yawn: Uh-huh.
"Mr. Gamble: You know what I'm saying?
"Mr. Yawn: Okay. There is a couple of questions that we wanted to ask you and see if we couldn't get it straightened out. Would you mind helping us out a little bit?
"Mr. Dehart [interrogating officer]: The reason we need to ask you a few more questions is, as you know, the investigators that talked with you in Virginia
"Mr. Gamble: Uh-huh.
"Mr. Dehart: And there was just a few things
"Mr. Gamble: Uh-huh.
"Mr. Dehart:we wanted to go through your statement with you and just clarify a few things and ask a couple of questions about some things that they hadn't covered.
"Mr. Gamble: Uh-huh.
"Mr. Dehart: If you wouldn't mind helping us out with that, we would appreciate it. Would that be all right?
"Mr. Gamble: You're sayingI put this statement on tape, [wrote] the statement down. Why should I have to go through all this all over again?
"Mr. Dehart: As I just explained to you, the investigators that talked with you up there didn't have as much knowledge. You know, I spoke with one of them on the phone and tried to give him a little bit of background about the case but not having worked the case and he wouldn't have as much knowledge about some of the details that we do that we need to go through and clear up some of those details with you.
"Mr. Gamble: Go."
(R. 1849-51.) Gamble was then advised of his Miranda rights; he stated that he understood his rights and informed the investigators that he wanted to waive them. Gamble then gave a statement to the investigating officers. Gamble argues that his statements to police quoted above were "clear and unequivocal ... with only a single meaning." (Gamble's brief to this court, p. 64). We are unpersuaded by his argument.
As we stated in Slaton v. State, 680 So.2d 879 (Ala.Cr.App.1995), aff'd, 680 So.2d 909 (Ala.1996), cert. denied, 519 U.S. 1079, 117 S.Ct. 742, 136 L.Ed.2d 860 (1997):
"The United States Supreme Court has held that police officers must inform people of their constitutional rights before beginning custodial interrogations. Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Included in the right to remain silent is a right to cut off questioning. Miranda, *428 384 U.S. at 474, 86 S.Ct. at 1628. When a defendant invokes his right to remain silent, that request must be `scrupulously honored.' Michigan v. Mosley, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975).
"This court recently stated that whether someone has invoked his right to remain silent is determined on a caseby-case basis.
"`Whether there was a waiver of the right to remain silent and the right to counsel and whether the confession was knowingly, voluntarily, and intelligently made must be decided from the particular facts and circumstances of each case, including the background, experience, and conduct of the accused the totality of the circumstances.'
"Holmes v. State, 598 So.2d 24, 26 (Ala. Crim.App.1992); see also Thomas v. State, 373 So.2d 1167 (Ala.1979), vacated on other grounds, 448 U.S. 903, 100 S.Ct. 3043, 65 L.Ed.2d 1133 (1980); Magwood v. State, 494 So.2d 124 (Ala. Crim.App.1985), aff'd, 494 So.2d 154 (Ala.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986).
"In this case, the police were questioning an admittedly scared 17-year-old who had just been arrested for murder and rape. He was visibly upset but had given no indication that he did not want to cooperate with the detectives and appeared to be readily responding to their questions. We are not persuaded that Slaton's response, `Oh God, I don't feel like going through all this,' was an unequivocal invocation of his right to remain silent. It does not strike us as any kind of conscious request that he be allowed to remain silent. Instead, Slaton's comment seems a natural outburst borne of the fear and anxiety created by the circumstances in which he found himself. Therefore, we hold that Slaton's statement was not an invocation of his right to remain silent, that his Miranda rights were not violated, and that his statement was properly used at trial."
680 So.2d at 886-87. "`Once informed of Miranda rights, an accused has the burden of indicating in some manner his wish to remain silent.'" Ex parte Slaton, 680 So.2d at 914, quoting Lightbourne v. Dugger, 829 F.2d 1012, (11th Cir.1987), cert. denied, 488 U.S. 934, 109 S.Ct. 329, 102 L.Ed.2d 346 (1988); see also Smith v. State, 756 So.2d 892 (Ala.Cr.App.1997), aff'd, 756 So.2d 957 (Ala.2000). "When a purported invocation of a Fifth Amendment privilege is ambiguous, the police may question the accused for the narrow purpose of clarifying the equivocal request." Beard v. State, 612 So.2d 1335, 1341 (Ala.Cr.App.1992) (citations omitted).
Here, Gamble's responses to police questioning were not an unequivocal invocation of his right to remain silent. The responses, instead, appear to be Gamble's simply saying that he did not understand why he had to go through everything about the robbery and murders again when he had already given a statement to police in Virginia. However, after the interrogating officers explained to him their purpose in wanting to question him further, Gamble was willing to answer questions posed by the Alabama authorities about the murders. For these reasons, we conclude that Gamble did not indicate that he wished to remain silent; thus, there was no violation of his Miranda rights in this regard.[6]

*429 IX.
Gamble contends that the trial court erred in admitting into evidence certain portions of his statement to police that, he says, contained irrelevant evidence of prior bad acts committed by his accomplice, Marcus Presley. In support of his claim, Gamble merely cites three pages of his transcribed statement given to investigators with the Shelby County Sheriff's Office. None of these specific portions of his statement was objected to at trial by Gamble; therefore, our review will be for plain error. Rule 45A, Ala.R.App.P. We have reviewed that portion of Gamble's statement cited by him, and we find nothing in those pages that was improper evidence of irrelevant prior bad acts committed by Presley.
Gamble first cites a portion of his statement in which he told police that Presley had, before the robbery in this case, said that he had to kill anyone he robbed who saw his face. (R.1914.) Gamble's theory of defense at trial was that although he had committed the robbery, he had no knowledge that Presley would kill the victims, and that he did not intend for the people at the pawnshop to get killed. Clearly, any evidence indicating Gamble's knowledge of Presley's intent when the two men entered the pawnshop was relevant and admissible to show Gamble's intent and knowledge when he robbed the pawnshop.
The only reference to Presley in Gamble's second citation to his transcribed statement is that while he was in the pawnshop, Gamble said that he heard Presley say, "Bitch, don't move," and then he heard a "boom." (R.1947.) Gamble made this statement to police while he was watching the surveillance videotape from the pawnshop and describing to the investigators what was happening on the videotape. Clearly, Gamble's description of the circumstances surrounding the robbery and murders was relevant evidence that was properly admitted at his trial.
Finally, Gamble cites to a portion of his statement in which he states, again while watching the surveillance videotape and describing to the investigators the events depicted on the videotape, Presley was telling him to get the guns from the pawnshop. Gamble also said in his statement that Presley's gun was "ragged" and did not work, and that Presley could have "lost his life." (R.1975.) Gamble, in response to police questioning, said that Presley liked that gun, but said that he had no knowledge of whether Presley had used the gun to commit other robberies. Again, we find nothing improper concerning the admission of this portion of Gamble's statement. Gamble's account of what happened at the pawnshop was certainly relevant at his trial, and he denied any knowledge of Presley's committing other robberies using the same gun.
We find that none of the portions of Gamble's statement complained of on appeal constituted improper evidence of prior bad acts committed by Presley. Thus, we find no error, plain or otherwise, as to this claim.

X.
Gamble further contends that the trial court erred in denying his motion for a mistrial made in response to an allegedly improper comment by the prosecutor during his rebuttal closing argument at the guilt phase of the trial. The record reveals that after the prosecutor concluded *430 his rebuttal argument, Gamble objected to a portion of the prosecutor's argument in which, Gamble says, the prosecutor implied that Gamble had a "duty to come to the aid" of the victims. (R. 1605.) Gamble argued that he had no legal duty to assist or to help the victims and, therefore, that the prosecutor's comments were improper and required a curative instruction by the trial court. The trial court denied Gamble's request for curative instructions, and Gamble moved for a mistrial.
In denying the motion for a mistrial, the trial court said:
"I find specifically that the argument I didn't take it to meanhe didn't argue there was a duty. He argued what [Gamble] could have done it if there was a possibility he was claiming that he didn't know there was to be a killing.
"And the Court will charge the jury as to what the law is and I will remind them that whatever they may have heard from the attorneys, while I'm sure that they will find it useful and beneficial, if it in any way conflicts with the law the Court will provide, they should follow the law the Court will provide and that only."
(R. 1606-07.)
Gamble does not specify in his brief to this court what portion of the prosecutor's argument he claims was improper. We have reviewed the closing arguments and we note that no objections were made on the grounds argued by Gamble in his request for curative instructions and in his motion for a mistrial. Thus, because Gamble did not timely object to the allegedly improper comments, we will review his claim under the plain-error rule. Rule 45A, Ala.R.App.P. "`This court has concluded that the failure to object to improper prosecutorial arguments ... should be weighed as part of our evaluation of the claim on the merits because of its suggestion that the defense did not consider the comments in question to be particularly harmful.'" Kuenzel v. State, 577 So.2d 474, 489 (Ala.Cr.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991), quoting Johnson v. Wainwright, 778 F.2d 623, 629 n. 6 (11th Cir.1985), cert. denied, 484 U.S. 872, 108 S.Ct. 201, 98 L.Ed.2d 152 (1987).
This court has stated that "[i]n reviewing allegedly improper prosecutorial comments, conduct, and questioning of witnesses, the task of this Court is to consider their impact in the context of the particular trial, and not to view the allegedly improper acts in the abstract." Bankhead v. State, 585 So.2d 97, 106 (Ala.Cr.App. 1989), remanded on other grounds, 585 So.2d 112 (Ala.1991), aff'd. on return to remand, 625 So.2d 1141 (Ala.Cr.App.1992), rev'd on other grounds, 625 So.2d 1146 (Ala.1993). See also Henderson v. State, 583 So.2d 276, 304 (Ala.Cr.App.1990), aff'd, 583 So.2d 305 (Ala.1991), cert. denied, 503 U.S. 908, 112 S.Ct. 1268, 117 L.Ed.2d 496 (1992). "In judging a prosecutor's closing argument, the standard is whether the argument `so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" Bankhead, 585 So.2d at 107, quoting Darden v. Wainwright, 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). "A prosecutor's statement must be viewed in the context of all of the evidence presented and in the context of the complete closing arguments to the jury." Roberts v. State, 735 So.2d 1244, 1253 (Ala.Cr.App.1997), aff'd, 735 So.2d 1270 (Ala.), cert. denied, 538 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999). Moreover, "statements of counsel in argument to the jury must be viewed as delivered in the heat of debate; *431 such statements are usually valued by the jury at their true worth and are not expected to become factors in the formation of the verdict." Bankhead, 585 So.2d at 106. "Questions of the propriety of argument of counsel are largely within the trial court's discretion, McCullough v. State, 357 So.2d 397, 399 (Ala.Cr.App.1978), and that court is given broad discretion in determining what is permissible argument." Bankhead, 585 So.2d at 105. We will not reverse the judgment of the trial court unless there has been an abuse of that discretion. Id. Further, "`[a] mistrial is a drastic and extreme measure which should be granted only when the prejudicial qualities of the comment cannot be eradicated by instruction or other action by the trial court.' Hurst v. State, 469 So.2d 720, 724 (Ala.Cr.App.1985)." Daniels v. State, 650 So.2d 544, 555 (Ala.Cr.App.1994), cert. denied, 514 U.S. 1024, 115 S.Ct. 1375, 131 L.Ed.2d 230 (1995); see also Arthur v. State, 711 So.2d 1031, 1052 (Ala.Cr.App. 1996), aff'd, 711 So.2d 1097 (1997). "`The grant or denial of a mistrial is a matter within the sound discretion of the trial court and will only be disturbed upon a showing of manifest abuse.'" Whitt v. State, 733 So.2d 463, 481 (Ala.Cr.App. 1998), quoting Huffman v. State, 706 So.2d 808, 809 (Ala.Cr.App.1997).
We have reviewed the prosecutor's closing arguments and, like the trial court, are unable to find any comments by the prosecutor, either direct or implied, that Gamble was under a legal duty to assist the victims. The prosecutor instead argued to the jury the evidence in the case he thought showed that Gamble was an accomplice to the murders. Gamble's theory of defense at trial was that although he was a participant in the robbery, he did not intend for Burleson and Littleton to be killed, and, therefore, he was not guilty of capital murder. The prosecutor properly argued to the jury evidence that contradicted that defense. The prosecutor has a right to present his impressions from the evidence. See Taylor v. State, 666 So.2d 36, 64 (Ala.Cr.App.), remanded on other grounds, opinion extended and aff'd on return to remand, 666 So.2d 71 (Ala.Cr. App.1994), aff'd, 666 So.2d 73 (Ala.1995), cert. denied, 516 U.S. 1120, 116 S.Ct. 928, 133 L.Ed.2d 856 (1996). The prosecutor may comment on proper inferences to be drawn from the evidence and may draw conclusions based on his or her own reasoning. Id.
The prosecutor did not, as Gamble argues on appeal, improperly imply to the jury that Gamble was under a legal duty to assist the victims. Further, the trial court correctly instructed the jurors that the comments of the lawyers were not evidence to be considered by them in reaching their verdict, and that the trial court would instruct them on the law as it applied to Gamble's case. Thus, the trial court did not abuse its discretion in refusing Gamble's request for curative instructions, because there was no error to cure, and it certainly did not abuse its discretion in denying his motion for a mistrial. No error, plain or otherwise, occurred as to this claim.

XI.
Gamble contends that the trial court erred in refusing to allow him to cross-examine a member of John Burleson's family in response to an allegation of juror misconduct made by Gamble's mother. He also contends that the trial court erred in refusing to allow him to question the juror alleged to have had the improper communication with the victim's family member.
The record reveals that on Saturday, November 22, during the penalty phase of the trial, Gamble's trial counsel brought to *432 the attention of the trial court an allegation of juror misconduct made by Gamble's mother, Mary Gamble. Specifically, counsel told the court that Ms. Gamble reported to him that on Thursday, November 20, she observed one of the jurors and a member of John Burleson's family, Kelley Burleson, "whispering" at a vending machine in the hallway outside of the courtroom. The trial judge stated that he would investigate Ms. Gamble's allegation, and he prohibited both the State and the defense from having any contact with Ms. Burleson or any other potential witnesses with knowledge of the incident prior to their testifying. He further limited questioning of the witnesses to the specific incident alleged by Ms. Gamble to have occurred on Thursday. The trial court noted that it was not prohibiting defense counsel from conducting a "full investigation," but that it would allow counsel only to inquire into the specific allegation made by Ms. Gamble. (R. 1743.)
Ms. Gamble was called by defense counsel and testified that she saw a female juror and Ms. Burleson whispering at the vending machines during a recess, but that she did not hear what they were whispering about. Ms. Gamble offered no explanation as to why she waited until the penalty phasetwo days after her son had been convicted of capital murder and two days after she allegedly observed the communication to report the matter to her son's attorneys. The trial judge then called Ms. Burleson as a witness. She testified that she was at work all day Thursday and that she was not at the courthouse on that day. Ms. Burleson told the court that there were numerous people she worked with, all of whom could verify that she was working on Thursday. The trial court then allowed defense counsel to question Ms. Burleson to determine whether Ms. Gamble could have gotten the days confused. Ms. Burleson said that she had at no time had any discussions with any of the jurors. Several other members of Ms. Burleson's family testified that Ms. Burleson was not in court on Thursday and that they had not seen her having a discussion with a juror in front of the vending machines.
"`Whether there has been a communication with a juror and whether it has caused prejudice are questions of fact to be determined by the trial court in the exercise of sound discretion.'" Burgess v. State, [Ms. CR-93-2054, November 20, 1998] ___ So.2d ___, ___ (Ala.Cr.App. 1998), quoting Gaffney v. State, 342 So.2d 403, 404 (Ala.Cr.App.1976), cert. denied, 342 So.2d 404 (Ala.1977). In discussing claims involving alleged juror misconduct, we said the following in Sistrunk v. State, 596 So.2d 644 (Ala.Cr.App.1992):
"`In the absence of any showing to the contrary, we must assume that the trial judge was satisfied as to the nature of the conversation which passed between the witness and the juror, and upon this basis decided that the appellant was not prejudiced thereby. Whether there has been a communication with a juror and whether it has caused prejudice are questions of fact to be determined by the trial court in the exercise of sound discretion. Gaffney v. State, Ala.Cr.App., 342 So.2d 403, [1976], cert. denied, Ala., 342 So.2d 404 (197[7]). This ruling will not be disturbed in the absence of a showing of abuse of discretion.'
"Cox v. State, 394 So.2d 103, 105-06 (Ala.Cr.App.1981).
"In Holland v. State, 588 So.2d 543 (Ala.Cr.App.1991), a case involving alleged juror contamination, this court reversed because the trial court undertook no inquiry into the circumstances of the *433 alleged improper communication. We observed that
"`... In cases involving juror misconduct, a trial court generally will not be held to have abused its discretion "where the trial court investigates the circumstances under which the remark was made, its substance, and determines that the rights of the appellant were not prejudiced by the remark." Bascom v. State, 344 So.2d 218, 222 (Ala.Cr.App.1977). However, the trial judge has a duty to conduct a "reasonable investigation of irregularities claimed to have been committed" before he concludes that the rights of the accused have not been compromised. Phillips v. State, 462 So.2d 981, 990 (Ala.Cr.App.1984).'
"Holland [v. State], 588 So.2d [543,] 546 [(Ala.Cr.App.1991)]. What constitutes a `reasonable investigation of irregularities claimed to have been committed' will necessarily differ in each case. A significant part of the discretion enjoyed by the trial court in this area lies in determining the scope of the investigation that should be conducted.
"`... A full evidentiary hearing at which witnesses and jurors can be examined and cross examined is not required. Tillman [v. United States], 406 F.2d [930][at] 938 [(5th Cir. 1969), vacated on other grounds, 395 U.S. 830, 89 S.Ct. 2143, 23 L.Ed.2d 742 (1969)]. The trial judge need not examine the juror to determine if that juror admits to being prejudiced before granting a mistrial.
"Woods v. State, 367 So.2d 974, 980 (Ala. Cr.App.), reversed on other grounds, 367 So.2d 982 (Ala.1978), partially quoted in Cox v. State, 394 So.2d 103, 105 (Ala.Cr.App.1981). As long as the court makes an inquiry that is reasonable under the circumstances, an appellate court should not reverse simply because it might have conducted a different or a more extensive inquiry. Generally, where the judge polls the jury and each juror indicates that there has been no improper communication, that is sufficient. See Ham v. State, 540 So.2d 805, 810 (Ala.Cr.App.1988); Ex parte Weeks, 456 So.2d 404, 407 (Ala.1984), cert. denied, 471 U.S. 1030, 105 S.Ct. 2051, 85 L.Ed.2d 324 (1985). There is no absolute requirement that a juror alleged to have received an improper communication be examined apart from the other jurors. See Smith v. State, 432 So.2d 550 (Ala.Cr.App.1983), and Hopkins v. State, 429 So.2d 1146, 1152 (Ala.Cr.App. 1983) (wherein the jury was questioned together as a group).
"`[W]hen the trial judge acts promptly to investigate the circumstances surrounding the making of an inherently prejudicial remark [to] a veniremember, determining specifically whether the remark was made and whether the remark had a prejudicial effect on those who, ultimately selected to serve as jurors, heard it, there is no error in the denial of a motion for mistrial based on jury contamination.' Holland v. State, 588 So.2d at 548."
596 So.2d at 648-49.
Here, the trial court questioned Ms. Gamble and Ms. Burleson individually and, after hearing from these witnesses, concluded that the alleged communication had not taken place. Contrary to Gamble's contention on appeal, the trial court did not prevent him from cross-examining Ms. Burleson about her alleged conversation with a juror. Both the State and defense counsel were permitted to question Ms. Burleson; however, Ms. Burleson said she was not in court on the day Ms. Gamble claimed the conversation occurred, and any further *434 questioning was unnecessary. Further, the trial court properly limited the questioning of the witnesses to the specific incident alleged to have occurred at the vending machines. As the trial court noted, it was investigating only that specific allegation of misconduct, and unless and until another allegation was made, its investigation would go no further; nor would it allow defense counsel to question the witnesses generally in an attempt to discover something that had not been alleged to have happened.
"`The scope of cross-examination in a criminal proceeding is within the discretion of the trial court, and it is not reviewable except for the trial judge's prejudicial abuse of discretion. The right to a thorough and sifting cross-examination of a witness does not extend to matters that are collateral or immaterial and the trial judge is within his discretion in limiting questions which are of that nature. Collins v. State, [Ala.Cr.App., 364 So.2d 368 (1978).]'"
Burton v. State, 487 So.2d 951, 956 (Ala. Cr.App.1984), quoting Coburn v. State, 424 So.2d 665, 669 (Ala.Cr.App.1982).
Thus, the trial court was under no obligation, absent some credible evidence of misconduct, to allow defense counsel the unfettered right to question the witnesses in an attempt to uncover misconduct. The trial court did, however, allow defense counsel to ask Ms. Burleson whether she had had any discussions with any of the jurors at any time during the trial. Ms. Burleson stated that she had never spoken to any of the jurors. Further, after the jury had returned its sentencing recommendation, the trial court asked the jurors whether any of them had had any communication "with any member of either the defendant's family or the victims' family or any other party or witness in this case since [they] began here on Monday morning other than is in the presence of the Court?" (R. 1845.) No jurors indicated that they had had any such communication. Additionally, the trial court instructed jurors, before the opening arguments at the guilt phase, that they were not to have any conversations with any of the parties or witnesses. (R. 953.)
The trial court acted promptly to investigate the alleged incident of juror misconduct. The record clearly shows that the trial court conducted a "reasonable investigation of irregularities claimed to have been committed." Gamble has made no showing that the trial court abused its discretion in finding that no improper communication occurred, nor that it abused its discretion in declining to question individually the juror alleged to have communicated with Ms. Burleson, or in limiting his cross-examination of the witnesses. Thus, we find no error as to this claim.

XII.
Gamble contends that the trial court erred when it refused to grant his motion for a mistrial, which was made with regard to alleged jury tampering. Specifically, Gamble refers to an incident during the penalty phase of the trial in which a spectator in the courtrooma member of the family of one of the victimscollapsed while the jury was leaving the courtroom for a short recess before the attorneys made their closing arguments. The record reveals that Gamble's trial counsel did not move for a mistrial immediately after the complained-of incident occurred. Instead, the motion for a mistrial was made later during the trial, after another unrelated instance of alleged jury tampering was investigated by the trial court. Thus, because the motion for a mistrial was untimely, we will review this claim pursuant *435 to the plain-error rule. Rule 45A, Ala. R.App.P.
After Gamble's counsel moved for a mistrial on the ground that the collapse of the member of the victim's family in front of the jury unfairly prejudiced Gamble's rights, the following discussion occurred:
"The Court: Let me ask counsel for the state. With regard to the establishment of the record, the onlythe questionI mean I think I certainly don't know the details because I'm probably the person seated the fartherest, although I do have a clear open view to that area.
"But as I recall, it was as the jurors were exiting the jury box. Whether or not some or part of those jurors had already exited into the door immediately adjacent to the jury box, I don't know. Possibly a few had but at least a good number I would say
"[The prosecutor]: They were about half and half. The first row was in. The second row had started.
"The Court: That is roughlybut even one or two of them who went into the door, in the jury room door still have a view of the area. So a number of the jurors, whether it be four or eight or something a little more, a little less, had a view of this incident whereby apparently one of Ms. Littleton's family members fell out, fainted, had a medical condition that caused her to fall or go to the ground there and there was a noise made by her and maybe someone else who hollered for help.
"[Defense counsel]: I think I heard the term `heart attack.'
"[The prosecutor]: Judge, I would take exception to this. I was looking at the jurors when that occurred. I turned and immediately looked at the individual who had fallen and then I stood and looked at the jurors and the purpose was I knew this would come from that.
"None of them that I could tell made any direct indication of looking for any extended period of time. They may have looked up but they continued their walk from the jury box to the jury room and were all inside the jury room in five, six seconds or less in which time the door was closed.
"I would also point out to the Court that neither one of the witnessesI would like to be very clear. Neither one of the witnesses [who] had testified [at the penalty phase] was this individual. This individual had been present in court and is a relative of the Littletons and is recognized by the entire family as having some heart difficulties.
"She stood up and got to the door as quickly as she could. She realized she was short of breath. She got outside the door. The door was mostly closed, two-thirds closed and hit her foot when she fell. I assume the jury could hear the door hit her foot, hear her fall, but the bailiff was very good in escorting them directly into the jury room. The door was closed. They didn't observe anything past that. They could not have.
"[Defense counsel]: I would add the sirens were heard right thereafter when a police officer called for help and the medics did come. And if I could hear the sirens inside the courtroom, I'm certain the jurors could hear the sirens also.
"[The prosecutor]: I don't doubt that but I didn't hear them.
"[Defense counsel]: Leading them to speculate that one of the victimshow serious the condition of one of the victim's relatives today and how would thatof course the argument here is that the impact that would have on the *436 minds and consciousness of the jurors taints this jury and that the motion for mistrial is due to be granted to protect the Constitutional rights of LaSamuel Gamble. And the defense did absolutely nothing to cause this incident to occur. I did occur and it can't be erased. You cannot charge the jury to forget what you saw.
"The Court: The Courtwhile I don't recall hearing sirens and I don't doubt that you did, that doesn't mean the jury did or didn't. I don't know.
"[Defense counsel]: Your Honor, if I could
"The Court: But the Court did note that the jurorsonce I realized that someone in the back door had fallen and there were people there attending to her, spectators who may have been standing by her, my attention immediately went to the jury room and immediately and as quickly as possible the bailiff did ensure the jurorsJohn, you did a good job of getting those jurors in there as quickly as possible and at my direction I think by my hand motions to him shut the door and they remained there until such time, about 10 minutes later, maybe 15 at the most, they remained in the jury room. They were escorted out the back door of the jury room and a way whereby they had no access to that scene and they were escorted to lunch at that time by Bailiff Guy.
"[Defense counsel]: After the fact.
"The Court: That was after the fact. But I simply state that as part of the record because again the Court did ensure as much as possible that once they were out of the courtroom that they had no further contact with that situation.
"[Defense counsel]: Of course, the medics did arrive. They put the injured party on a stretcher and she was obviously taken from the courthouse on a stretcher.
"The Court: I don't know. That's not part of what the Court observed, and I don't doubt that and I don't dispute that and I will assume for argument's sake that that's true....
". . . .
"The Court: But even in light of that, I'm going to deny your motion for mistrial. I think that I can deal with that by instruction to the jury that they should not allow any emotional circumstance or any emotion, sympathy or prejudice to influence their verdict. Their verdict must be based solely upon the evidence in this case, not upon those other factors.
"[The prosecutor]: Judge, just for the sake of the record, I would like the record to note or the record to reflect that this lady did indeed have a medical problem. It was not some sort of a ruse or some sort of a planned deal to get sympathy on the part of the State or what have you.
"The Court: I assume that to be the case.... Even with that, I will deny defendant's motion. The Court notes and I don't think the defendant has alleged by any means that the incident was a ruse or in any way put on.
"[Defense counsel]: We would not make that an issue, Your Honor, certainly not.
"The Court: I am going to deny the motion for mistrial. I will consider some type of further limiting instruction about reminding them even further than I would normally that again do not allow prejudice or emotion to influence you. If the parties become aware of the lady's condition or circumstances, I would appreciate a report with regard to that."
(R. 1759-68.) In addition to instructing the jury that its sentencing recommendation should not be based on passion, prejudice, *437 or any other arbitrary factor, the trial court, just prior to closing arguments at the penalty phase, instructed the jury as follows:
"Good afternoon, ladies and gentlemen. We are ready to get started back with closing arguments on the second phase of this trial. First off, I think I need to caution you. There was an incident that occurred in the back of the courtroom. Some of you may have seen that as you left, may not have. If you didn't, that's fine.
"That is not a matter for you to worry about or be concerned about or in any way affect your decisions or any recommendations which you have in this case. The person who was involved in that was not and had not been a witness in this case. It was some other spectator and that person has been provided medical assistance as needed and is doing, as I understand, okay at this time."
(R. 1784.)
Although he did not maintain at trial that the spectator's collapse in the courtroom was a "ruse" designed to gain sympathy from the jury, Gamble now argues on appeal that the conduct of the victim's family was one of a "deliberate and staged series of actions with the purpose of influencing the jury." (Gamble's brief to this court, p. 59.) We have reviewed the record and find no support for this contention. Gamble has offered nothing to substantiate his claim, and we are unpersuaded by his argument that "jury tampering" occurred. In McNair v. State, 653 So.2d 320 (Ala.Cr.App.1992), aff'd, 653 So.2d 353 (Ala.1994), cert. denied, 513 U.S. 1159, 115 S.Ct. 1121, 130 L.Ed.2d 1084 (1995), we said the following, relevant to this claim:
"`[A]s a general rule, a demonstration by, or the misconduct of, a bystander or spectator during a criminal trial including even a disturbance having a tendency to influence or disturb the juryis not deemed to be sufficient reason for the granting of a new trial unless it appears that the rights of the accused were prejudiced thereby, and, generally, in the absence of a showing to the contrary, it will be assumed that the jury was not prejudiced; similarly, manifestations of grief by spectators related to the victim of a crime, as a general matter, will not alone furnish good ground for a new trial, a showing being required that the case of the accused was prejudiced by such conduct.'
"Annot., 31 A.L.R.4th 229, 234-35 (1984)....
". . . .
"Here, as in Smith [v. State], 37 Ala. App. [116] at 118, 64 So.2d [620] at 621 [, cert. denied, 258 Ala. 647, 64 So.2d 622 (1953)]: `The trial judge witnessed the incident[s]. To him must of necessity be committed a wide discretion in determining whether or not the occurrence[s] affected the rights of the accused to a fair, impartial trial.'"
653 So.2d at 329-30; see also Smith v. State, 727 So.2d 147 (Ala.Cr.App.1998), aff'd, 727 So.2d 173 (Ala.), cert. denied, 528 U.S. 833, 120 S.Ct. 91, 145 L.Ed.2d 77 (1999); DeBruce v. State, 651 So.2d 599 (Ala.Cr.App.1993), aff'd, 651 So.2d 624 (Ala.1994).
We find nothing in the record, nor has Gamble offered anything on appeal, to indicate that the jury's sentencing recommendation was improperly influenced by the incident, or that Gamble was denied his right to a fair and impartial trial as a result of the family member's collapse in the courtroom.
"`A motion for a mistrial implies a miscarriage of justice and is such a serious *438 matter that it should be granted only where there is a fundamental error in the trial which would vitiate the result. Montgomery v. State, 446 So.2d 697, 702 (Ala.Cr.App.1983), cert. denied, 469 U.S. 916, 105 S.Ct. 291, 83 L.Ed.2d 227 (1984).'"
Jenkins v. State, 627 So.2d 1034, 1048 (Ala.Cr.App.1992), aff'd, 627 So.2d 1054 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1388, 128 L.Ed.2d 63 (1994), quoting Thompson v. State, 527 So.2d 777, 779 (Ala.Cr.App.1988). Further, "`[a] trial judge is allowed broad discretion in determining whether a mistrial should be declared, because he is in the best position to observe the scenario, to determine its effect upon the jury, and to determine whether a mistrial should be granted.'" Garrett v. State, 580 So.2d 58, 60 (Ala.Cr. App.1991), quoting Dixon v. State, 476 So.2d 1236, 1240 (Ala.Cr.App.1985).
Here, the trial court observed the incident and was therefore in a better position than this court to determine whether the incident affected Gamble's rights. The trial court's actions in instructing the jury to disregard the occurrence involving the spectator were certainly sufficient to eradicate any prejudice that may have resulted from the incident in the courtroom. We also note that contrary to Gamble's assertion in brief, our review of the record does not reveal that there were "continuous and unabated" emotional displays during the trial by members of the victims' families. (Gamble's brief to this court, p. 59.) Thus, we find no error, plain or otherwise, as to this claim.

XIII.
Gamble contends that the trial court erred by allowing into evidence testimony relating to collateral crimes. Specifically, Gamble argues that the evidence concerning other robberies and shootings allegedly committed by him and Presley before the pawnshop robbery should not have been admitted because, he says, the evidence was not probative of any issue in the case and it was offered solely to show his bad character or his propensity to commit criminal acts. The record reveals that the trial court admitted the evidence of collateral crimes, finding that the evidence was relevant and admissible to show Gamble's intent and knowledge.
The State presented the testimony of several witnesses, all of whom testified concerning robberies and shootings allegedly committed by Gamble and Presley. James Rice, a detective sergeant with the Hueytown Police Department, testified that after Gamble had been arrested for the pawnshop robbery in this case and questioned by the Shelby County Sheriff's Office, he questioned Gamble about two earlier robberies that had occurred in Hueytown. One of the robberies occurred in June 1996 at J & S Produce. Gamble admitted to being present with Presley during that robbery, and also admitted that he left his handgun at the store when he and Presley fled after the robbery. Gamble denied that a shooting occurred during the J & S Produce robbery. However, the victim of the robbery identified both Gamble and Presley as the perpetrators, and further said that he was forced to lie facedown behind the store's counter and that Presley then fired a shot at him that missed.
Detective Rice also testified concerning another robbery and shooting at the Amoco Food Mart on June 18, 1996. Rice testified that he investigated the robbery, at which two employees in the store were shot, one of whom later died. During his questioning by Rice, Gamble admitted to robbing the Amoco Food Mart with Presley. Also testifying for the State was Henry Joe Cash, the surviving victim of the *439 Amoco Food Mart robbery. Cash testified that at approximately 11:00 p.m., just after the store had closed, two black males, whom Cash identified as Gamble and Presley, knocked on the door, saying that they wanted to purchase a cigarette lighter. Cash let the men in, and Gamble ordered him and the other employee to lie facedown on the floor. According to Cash, Gamble told him not to look at him and that he would kill him if he did not open the store's safe. Cash said that Gamble shot him once, reached in his [Cash's] pockets, shot him again, and then shot the other employee. Cash further said that Gamble shot him one more time and took his billfold. In his statement to investigators with the Shelby County Sheriff's Office, Gamble said that he did not remember anyone being shot in the Amoco Food Mart robbery.
Cindy Thomas, the owner of the City Limit Package Store in Clanton, testified that on June 29, 1996, she was working at the package store when, at approximately 3:00 p.m., Presley came into the store, pulled out a gun, and forced her to lie facedown on the floor. Presley ordered her to open the safe and then complained that she was moving too slowly. After she opened the safe, Presley again ordered her to lie facedown on the floor and shot her once in the back. Thomas stated that approximately one week before the robbery, Presley and two other men, whom she identified as Gamble and McKenzie, came into the store to use the bathroom. Thomas testified that she was suspicious of the men and that after they left, she called the police to send an officer at closing time. In his statement to the Shelby County authorities, Gamble said that he was supposed to go with Presley to rob the City Package Store but that, instead, he went somewhere with his sister; however, Gamble admitted that one of the men with Presley when the store was robbed told him that the owner of the store was shot. Gamble stated that this individual also said to him that everyone knew that Presley would shoot if the victims saw his face.
"On the trial for the alleged commission of a particular crime, evidence of the accused's having committed another act or crime is not admissible if the only probative function of such evidence is to prove bad character and the accused's conformity therewith. This is a general exclusionary rule which prevents the introduction of prior acts or crimes for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question....
". . . .
"The foregoing exclusionary rule does not work to exclude evidence of all crimes or acts, only such as are offered to show the defendant's bad character and conformity therewith on the occasion of the now-charged crime. If the defendant's commission of another crime or misdeed is relevant for some other material purpose in the case then it may be admitted."
C. Gamble, McElroy's Alabama Evidence, § 69.01(1) at 300-01 (5th ed.1996) (footnotes omitted). "This rule is generally applicable whether the other crime or act was committed before or after the one for which the defendant is presently being tried." Id. at 300.
"[E]vidence of collateral offenses may be admissible under certain exceptions to the exclusionary rule or for `other purposes' than to prove the accused's guilt." Williamson v. State, 629 So.2d 777, 780 (Ala.Cr.App.1993). In Nicks v. State, 521 So.2d 1018 (Ala.Cr.App. 1987), aff'd, 521 So.2d 1035 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988), this court discussed *440 the exceptions to the general exclusionary rule:
"Numerous Alabama cases list the exceptions to the general exclusionary rule, or tests for relevancy, whereby evidence of collateral crimes or acts may be admitted. These exceptions include the following:
"`(1) Relevancy to prove physical capacity, skill, or means to commit the now-charged crime; (2) part of the res gestae or part of a continuous transaction; (3) relevancy to prove scienter or guilty knowledge; (4) relevancy to prove criminal intent; (5) relevancy to prove plan, design, scheme, or system; (6) relevancy to prove motive; (7) relevancy to prove identity; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes.'
"Nelson v. State, 511 So.2d 225, 233 (Ala.Cr.App.1986). See also Twilley v. State, 472 So.2d 1130 (Ala.Cr.App.1985); Brewer v. State, [440 So.2d 1155 (Ala.Cr. App.), cert. denied, 440 So.2d 1155 (1983)]; Miller v. State, 405 So.2d 41 (Ala.Cr.App.1981); Thompson v. State, 374 So.2d 377 (Ala.Cr.App.1978), aff'd, 374 So.2d 388 (Ala.1979); McMurtrey v. State, 37 Ala.App. 656, 74 So.2d 528 (1954); Wilkins v. State, 29 Ala.App. 349, 197 So. 75, cert. denied, 240 Ala. 52, 197 So. 81 (1940); McElroy's §§ 69.01(1)-(11); Schroeder, Evidentiary Use in Criminal Cases of Collateral Crimes and Acts: A Comparison of the Federal Rules and Alabama Law, 35 Ala.L.Rev. 241 (1984). All of the exceptions relate to the relevancy of the evidence, which means that evidence of separate and distinct crimes is admissible only when the evidence is relevant to the crime charged. Mason v. State, 259 Ala. 438, 66 So.2d 557 (1953); Noble v. State, 253 Ala. 519, 45 So.2d 857 (1950).
"`All evidence is relevant which throws, or tends to throw, any light upon the guilt or the innocence of the prisoner. And relevant evidence which is introduced to prove any material fact ought not to be rejected merely because it proves, or tends to prove, that at some other time or at the same time the accused has been guilty of some other separate, independent and dissimilar crime. The general rule is well settled that all evidence must be relevant. If evidence is relevant upon the general issue of guilt, or innocence, no valid reason exists for its rejection merely because it may prove, or may tend to prove, that the accused committed some other crime, or may establish some collateral and unrelated fact. Evidence of other acts to be available must have some logical connection and reveal evidence of knowledge, design, plan, scheme, or conspiracy of the crime charged; or circumstantial evidence of identity of the person charged with the crime; or tends to corroborate direct evidence admitted.'
"Underhill, Criminal Evidence § 154 (3d ed. 1923)."
521 So.2d at 1025-26. "`The decision whether to allow or not to allow evidence of collateral crimes or acts as part of the State's case-in-chief rests within the sound discretion of the trial judge.'" Akin v. State, 698 So.2d 228, 234 (Ala.Cr.App. 1996), cert. denied, 698 So.2d 238 (Ala. 1997), quoting Blanco v. State, 515 So.2d 115, 120 (Ala.Cr.App.1987).
In Bradley v. State, 577 So.2d 541 (Ala.Cr.App.1990), this court stated:
"We have recognized that the list of traditionally recognized exceptions is not exhaustive and fixed. See Nicks v. State, 521 So.2d [1018] at 1025 [(Ala.Cr.App.1987), aff'd, 521 So.2d 1035 *441 (Ala.), cert. denied, 487 U.S. 1241, 108 S.Ct. 2916, 101 L.Ed.2d 948 (1988)]. `It must ever be borne in mind that the state may prove the accused's commission of another crime if such other crime is relevant for any purpose other than that of showing his guilt through the medium of bad character.' C. Gamble, McElroy's Alabama Evidence § 69.0(1) (3d ed. 1977) (quoting Mr. Justice McElroy, 2nd ed.)
"`In all instances, the question is whether the proposed evidence is primarily to prove the commission of another disconnected crime, or whether it is material to some issue in the case. If it is material and logically relevant to an issue in the case, whether to prove an element of the crime, or to controvert a material contention of defendant, it is not inadmissible because in making the proof the commission of an independent disconnected crime is an inseparable feature of it.'
"Snead v. State, 243 Ala. 23, 24, 8 So.2d 269, 270 (1942). However, even though evidence of collateral crimes or acts may be relevant to an issue other than the defendant's character, it should be excluded if `it would serve comparatively little or no purpose except to arouse the passion, prejudice, or sympathy of the jury,' Spellman v. State, 473 So.2d 618, 621 (Ala.Cr.App.1985), or put another way, `unless its probative value is "substantially outweighed by its undue prejudice,"' United States v. Stubbins, 877 F.2d 42, 43 (11th Cir.), cert. denied, 493 U.S. 940, 110 S.Ct. 340, 107 L.Ed.2d 328 (1989) (quoting United States v. Beechum, 582 F.2d 898 (5th Cir.1978) (en banc), cert. denied, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472(1979)).
". . . .
"Rather than uphold the trial court by straining to neatly fit the evidence of the three prior incidents into the narrow confines of the traditionally recognized categories, we have chosen to review the court's ruling by determining whether the evidence was `material and logically relevant' to an issue or issues in the case."
577 So.2d at 547-48. "If evidence of the accused's commission of another crime is admissible, the state may prove in meticulous detail the manner in which the accused committed such other crime." Bush v. State, 695 So.2d 70, 85 (Ala.Cr.App. 1995), aff'd, 695 So.2d 138 (Ala.), cert. denied, 522 U.S. 969, 118 S.Ct. 418, 139 L.Ed.2d 320 (1997).
We find that, in this case, the evidence of the collateral crimes was material and logically relevant to show Gamble's intent and knowledge in committing the charged crime. "`If an accused is charged with a crime that requires a prerequisite intent, ... then prior or subsequent criminal acts are admissible to establish that he had the necessary intent when he committed the instant crime.'" Hinton v. State, 632 So.2d 1345, 1348 (Ala. Cr.App.1993), quoting Jones v. State, 439 So.2d 1308, 1310 (Ala.Cr.App.1983) (emphasis in Hinton omitted). In addition:
"Evidence of the accused's commission of another crime or act is admissible if knowledge of a certain fact (which usually means the accused's reason to believe the existence of such fact in consequence of things seen or information received) is an element of the nowcharged crime and the accused's commission of such other crime or act is relevant to show such knowledge. Many decisions speak of this particular purpose as synonymous with intent."
C. Gamble, McElroy's Alabama Evidence, § 69.01(4) at 314 (5th ed. 1996) (footnotes omitted).
*442 To prove the capital-murder charge, the State, proceeding under an accomplice-liability theory, was required to show that Gamble intentionally murdered Burleson and Littleton during a robbery in the first degree. Gamble's theory of the case was that although he intended to commit a robbery at the pawnshop, he never intended to murder, and never actually participated in the murders of, Burleson and Littleton. In support of his theory of defense at trial, Gamble's counsel repeatedly argued to the jury that Gamble had no knowledge that Presley was going to shoot the victims; and that Gamble had no intent that they be killed; that Gamble did nothing to aid and abet Presley in the killings; and that, therefore, Gamble was guilty only of robbery and possibly attempted murder for firing a shot at Burleson. Gamble's claim that he did not know, that Burleson and Littleton would be shot and killed, much less intend to kill them, bore directly on the issue whether Gamble did, in fact, intend that the victims be killed. Because Gamble's intent and knowledge when he entered the pawnshop were called into question, his prior actions in the robberies and shootings at the other stores were relevant to prove his intent and knowledge during the pawnshop robbery. The testimony concerning the collateral crimes was admissible because it was probative of matters in issue other than Gamble's bad character or his propensity to commit criminal acts.
Furthermore, we find that the probative value of the collateral-crimes evidence clearly outweighed its prejudicial effect, particularly in view of Gamble's theory of defense at trial. Finally, the trial court's repeated limiting instructions, given after the testimony of each collateral-crimes witness, and given several times during the trial court's oral charge to the jury, were sufficient to apprise the jury of its responsibilities in considering the collateralcrimes evidence. Accordingly, the trial court did not abuse its discretion in admitting the evidence of the prior robberies and shootings committed by Gamble and Presley.
In a related argument, Gamble also contends that the trial court erred in overruling his motion in limine requesting that the State not be allowed to question Gamble, if he testified, concerning any prior robberies and shootings he allegedly committed. Again, Gamble argued that evidence of the collateral crimes was admitted only to show his bad character. For the reasons discussed above, the evidence was properly admitted at trial, and the State could have, had Gamble testified, properly cross-examined him about the prior bad acts. Thus, the trial court correctly denied Gamble's motion in limine.
Gamble also contends that during the closing arguments at the guilt phase, the State was improperly allowed to comment to the jury on the prior bad acts allegedly committed by Gamble, which, the State maintained, evidenced his intent to kill the victims of the pawnshop robbery. Again, Gamble claims that because the evidence was admitted only to show his bad character, it was improper to allow the State to make arguments to the jury concerning the prior bad acts committed by Gamble and present to the jury the State's theory of the significance of those prior bad acts. This claim is presented for the first time on appeal; therefore, we will review it for plain error. Rule 45A, Ala.R.App.P.
As we said above, the collateral-crimes evidence was properly admitted during trial and, therefore, was the proper subject of comment by the prosecutor during his closing arguments. No error, plain or otherwise, occurred as to this claim.

XIV.
Gamble also contends that the trial court erroneously denied his motions for *443 a judgment of acquittal made at the close of the State's case-in-chief and after both sides had rested. Gamble admitted that he was guilty of robbery, but he denied that he was guilty of intentionally killing Burleson and Littleton. Specifically, he argues that because he was not the shooter and because, according to him, he did nothing to aid or abet Presley, the triggerman, and did not intend to kill the victims, he was not guilty of capital murder. We disagree; there was sufficient evidence from which the jury could have reasonably concluded that Gamble was an accomplice to the intentional killings of Burleson and Littleton.
"In a challenge of the sufficiency of the evidence, an appellate court must consider the evidence in the light most favorable to the prosecution, and the appellate court will not substitute its judgment for that of the trier of fact." Maddox v. State, 620 So.2d 132, 133 (Ala.Cr. App.1993). Conflicting evidence presents a jury question not subject to review on appeal, provided that the State's evidence established a prima facie case. Gunn v. State, 387 So.2d 280 (Ala.Cr.App.), cert. denied, 387 So.2d 283 (Ala.1980). A trial court's denial of a motion for a judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury, at the time the motion was made, from which the jury, by fair inference, could have found the defendant guilty beyond a reasonable doubt. Willis v. State, 447 So.2d 199 (Ala.Cr.App.1983). Furthermore:
"`"A verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this Court that it was wrong and unjust."'"
McCollum v. State, 678 So.2d 1210, 1215 (Ala.Cr.App.1995), quoting Cox v. State, 500 So.2d 1296 (Ala.Cr.App.1986), quoting, in turn, other cases.
Section 13A-2-23, Ala.Code 1975, Alabama's accomplice-liability statute, provides, in pertinent part:
"A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense:
". . . .
"(2) He aids or abets such other person in committing the offense...."
Concerning the role of an accomplice in a capital offense, this court has said:
"`"Aid and abet `comprehend all assistance rendered by acts or words of encouragement or support or presence, actual or constructive, to render assistance should it become necessary.'" Jones v. State, 174 Ala. 53, 57, 57 So. 31 (1911), quoted in Radke v. State, 292 Ala. 290, 292, 293 So.2d 314 (1974). If the jury is convinced beyond a reasonable doubt that the defendant was present with a view to render aid should it become necessary, the fact that the defendant is an aider and abettor is established. Jones, supra; Raiford v. State, 59 Ala. 106, 108 (1877). "The culpable participation of the accomplice need not be proved by positive testimony, and indeed rarely is so proved. Fuller v. State, 43 Ala.App. 632, 198 So.2d 625. Rather, the jury must examine the conduct of the parties and the testimony as to the surrounding circumstances to determine its existence." Miller v. State, 405 So.2d 41, 46 (Ala. Cr.App.1981); Watkins v. State, 357 So.2d 156, 159 (Ala.Cr.App.1977), cert. denied, 357 So.2d 161 (Ala.1978).'

*444 "Furthermore, in Sanders v. State, 423 So.2d 348, 351 (Ala.Cr.App.1982), it was stated:
"`Community of purpose may be formed in a flash, and participation and community of purpose may be shown by circumstantial evidence or inferred from the conduct of the participants. Smith v. State, 57 Ala.App. 151, 326 So.2d 680 (1975). Such facts as the defendant's presence in connection with his companionship, his conduct at, before, and after the commission of the act, are potent circumstances from which participation may be inferred. Smith, supra.'"
Watkins v. State, 495 So.2d 92, 102 (Ala. Cr.App.1986), quoting Gwin v. State, 456 So.2d 845, 851 (Ala.Cr.App.1984) (emphasis omitted); see also Arthur v. State, 711 So.2d 1031, 1057 (Ala.Cr.App.1996), aff'd, 711 So.2d 1097 (Ala.1997), quoting Watkins, supra; Travis v. State, 776 So.2d 819, 863 (Ala.Cr.App.1997).
Further, in Rowell v. State, 570 So.2d 848 (Ala.Cr.App.1990), we said:
"The appellant concedes that he committed the robbery element of this offense and there is no question that the murder was committed during the commission of, or immediate flight from the commission of the robbery; however, the appellant contends that he did not intentionally kill the victim. The question of a defendant's intent at the time of the commission of the crime is usually an issue for the jury to resolve. Crowe v. State, 435 So.2d 1371, 1379 (Ala.Cr.App. 1983).
"`"[N]o defendant is guilty of a capital offense unless he had an intent to kill, and that intent to kill cannot be supplied by the felony murder doctrine. Beck v. State, 396 So.2d 645, 662 (Ala. March 6, 1981)"; Carnes, Alabama's 1981 Capital Punishment Statute, 42 Ala.Law. 456, 468 (1981). See also Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), but see Godbolt v. State, 429 So.2d 1131, 1134 (Ala.Cr.App.1982), holding that Enmund is inapplicable to a defendant who does not receive the death penalty. However, a non trigger man can be convicted of a capital offense if he was a knowing accomplice to the intentional killing itself. Ritter v. State, 375 So.2d 270 (Ala.1979). "The accomplice liability doctrine may be used to convict a nontrigger man accomplice, if, but only if, the defendant was an accomplice in the intentional killing as opposed to being an accomplice merely in the underlying felony." Ex parte Raines, 429 So.2d 1111, 1112 (Ala.1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1804, 76 L.Ed.2d 368 (1983).
"`Alabama's 1981 capital punishment statute under which [the defendant] was convicted "provides that a defendant who does not personally commit the intentional killing which is part of the capital offense is nonetheless guilty of it and can be convicted of the capital offense, if that defendant intentionally promotes or assists in the commission of the intentional killing which is actually done by another." Carnes, 42 Ala. Law at 471.
"`Our duty on appeal was stated in Raines, 429 So.2d at 1113. "To affirm a finding of a `particularized intent to kill', the jury must be properly charged on the intent to kill issue, and there must be sufficient evidence from which a rational jury could conclude that the defendant possessed the intent to kill."'
"Lewis v. State, 456 So.2d 413, 416-17 (Ala.Cr.App.1984).

*445 "In the present case, there was sufficient evidence from which a rational jury could conclude that the appellant possessed the intent to kill. All of the men had begun this series of events with the intention of committing robberies and in possession of a gun. The gun had been passed between the two cars and, after blocking off the victim, the appellant and the armed accomplice attempted to enter the vehicle from the driver's side. After the shooting, they ran together back to the waiting Grand Am. Moreover, the trial judge charged the jury that the doctrine of felony murder could not be included as a component part of the capital charge. He explained that the jury must find an intentional killing and, at length, explained to the jury what is required in order to find the element of intent. `"Whether a non-trigger man aided and abetted the actual killing itself, such as by being present to render assistance in the killing itself if it becomes necessary, will almost always be a jury question." 42 Ala. Law at 469. See also Tomlin v. State, 443 So.2d 47, 53 (Ala.Cr.App.1979), affirmed, Ex parte Tomlin, 443 So.2d 59, 64 (Ala.1983).' Lewis v. State, supra, at 418. The trial court did not err in denying the appellant's motion for judgment of acquittal at the close of the State's evidence."
570 So.2d at 850-51.
It is indeed unusual to have the commission of a crime recorded on videotape. Here, we are fortunate to have the benefit of such a videotape, and after viewing it, in conjunction with Gamble's statements to police, we are convinced that there was more than sufficient evidence from which the jury could reasonably conclude that Gamble was an accomplice to the intentional murders of Burleson and Littleton.
The videotape reveals that shortly after Gamble and Presley entered the pawnshop and forced Burleson and Littleton to lie down on the floor, Gamble approached Burleson and pointed his gun close to Burleson's head. In his statement to investigators with the Shelby County Sheriff's Office (made while Gamble watched the videotape with the investigators and described to them the events depicted on the videotape), Gamble said that Presley had told him to watch the victims while he (Presley) went to the safe in the back of the pawnshop. According to Gamble, Burleson tried to move, so Gamble cocked his gun and "was fixing to shoot him." Gamble said that he fired his gun, but did not shoot Burleson. The bullet hit the floor approximately 3-4 feet from Burleson's head. Gamble never told the investigators that he fired his gun only to scare Burleson. Gamble also said in his statement that it was his idea to rob the pawnshop and that he was the one who found the pawnshop, while driving through Shelby County on their way to Birmingham.
The videotape also reveals that after Presley fired the first shot at the victims, his gun jammed. Presley, while attempting to fix his gun, motioned to Gamble, who was standing just outside the front door. According to Gamble's statement, Presley was motioning for him and calling out, "Main, Main." Although Gamble denied hearing the first shot or hearing Presley call to him (he said that if he had seen Presley motioning to him he would have come back into the pawnshop), the videotape shows Gamble coming back into the pawnshop after Presley motioned to him and walking toward Presley. The videotape then shows Gamble returning to the front of the pawnshop, turning around and coming back toward Presley, who at this time had already fired a second shot at the victims and whose gun had again jammed. Gamble then began picking up unspent bullets that had fallen out of Presley's gun *446 while he was trying to unjam it. Presley then fired yet another shot, and the videotape shows Gamble looking over the counter at the victims. The two men then quickly left the pawnshop. Gamble also said in his statement that he knew, before the pawnshop robbery, that "anybody that he [Presley] rob and they see his face, he got to kill them. He said they see his face, he got to kill them." (R.1914.) Neither Presley nor Gamble attempted to conceal his face during the robbery.
Although we find the evidence stated above to be sufficient to allow the jury to find that Gamble was an accomplice to the intentional killings of Burleson and Littleton, we note that other evidence at trial, which included testimony concerning collateral crimes, provided the jury with even further evidence to support a finding that Gamble was an accomplice to the intentional murders. Gamble was present with a view to render aid should it become necessary, and it appears from the videotape and from his statements to police that he did, in fact, provide Presley assistance in the killings.
Here, as in Rowell, supra, whether Gamble had the particularized intent to kill Burleson and Littleton was a question for the jury to resolve. The jury was properly instructed on accomplice liability and the intent to kill necessary to find Gamble guilty of capital murder. Viewing the evidence in a light most favorable to the prosecution, we find that there was sufficient evidence to allow the jury to find beyond a reasonable doubt that Gamble was prepared to kill, that he intended to kill, and that he supported Presley in killing Burleson and Littleton. Thus, the trial court properly denied Gamble's motions for a judgment of acquittal.

XV.
Gamble contends that the death penalty was inappropriate in this case because, he says, it was uncontroverted at trial that he was not the "shooter." Acknowledging that the law is contrary to his position, Gamble nonetheless argues that "if there is to be a death penalty, it is constitutional to apply [it] only to the person who commits the act" and that both the state and federal constitutions "are violated when the death penalty is allowed for one who did not kill." (Gamble's brief to this court, p. 69.) This claim is presented for the first time on appeal; therefore, we will review it only for plain error. Rule 45A, Ala.R.App.P.
As we said in Part XIV of this opinion, the death penalty can be imposed upon a nontriggerman accomplice so long as there is proof that he was an accomplice to the intentional killing as opposed to being an accomplice merely in the underlying felony. See also Travis v. State, 776 So.2d 819, 863 (Ala.Cr.App.1997); Haney v. State, 603 So.2d 368, 386 (Ala.Cr.App. 1991), aff'd, 603 So.2d 412 (Ala.1992), cert. denied, 507 U.S. 925, 113 S.Ct. 1297, 122 L.Ed.2d 687 (1993); Womack v. State, 435 So.2d 754, 762-63 (Ala.Cr.App.1983), aff'd, 435 So.2d 766 (Ala.), cert. denied, 464 U.S. 986, 104 S.Ct. 436, 78 L.Ed.2d 367 (1983). "[I]n Alabama, an individual who is present with the intent to aid and abet in the commission of an offense is as guilty as the principle wrongdoer.... As long as the appellant intentionally promoted or aided in the commission of the killing itself, whether he actually committed the murder does not affect his liability or his guilt." Price v. State, 725 So.2d 1003, 1055 (Ala. Cr.App.1997), aff'd, 725 So.2d 1063 (Ala. 1998), cert. denied, 526 U.S. 1133, 119 S.Ct. 1809, 143 L.Ed.2d 1012 (1999) (citations omitted); see also §§ 13A-2-20 through 13A-2-23 and 13A-5-40(c), Ala. Code 1975. Thus, because the evidence was sufficient to allow the jury to reasonably *447 conclude that Gamble aided and abetted Presley in the commission of the murders, whether Gamble pulled the trigger is of no legal consequence. Thus, his death sentence was proper, and this claim is meritless.

XVI.
Gamble contends that the jury and the trial court impermissibly "doublecounted" the robbery charge against him both as an element of the capital offense and as an aggravating circumstance. There is no merit to this contention.
"The practice of permitting the use of an element of the underlying crime as an aggravating circumstance is referred to as `double-counting' or `overlap' and is constitutionally permissible." Coral v. State, 628 So.2d 954, 965 (Ala.Cr.App.), aff'd. on return to remand, 628 So.2d 988 (Ala.Cr.App.1992), aff'd, 628 So.2d 1004 (Ala.1993), cert. denied, 511 U.S. 1012, 114 S.Ct. 1387, 128 L.Ed.2d 61 (1994); see also Ex parte Trawick, 698 So.2d 162 (Ala.), cert. denied, 522 U.S. 1000, 118 S.Ct. 568, 139 L.Ed.2d 408 (1997); and Hart v. State, 612 So.2d 520 (Ala.Cr.App.), aff'd, 612 So.2d 536 (Ala.1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993). Section 13A-5-50, Ala.Code 1975, contemplates that certain aggravating circumstances will be considered established for purposes of sentencing when a verdict of guilty of capital murder is returned. That section specifically provides:
"The fact that a particular capital offense as defined in Section 13A-5-40(a) necessarily includes one or more aggravating circumstances as specified in Section 13A-5-49 shall not be construed to preclude the finding and consideration of that relevant circumstance or circumstances in determining sentence. By way of illustration and not limitation, the aggravating circumstance specified in Section 13A-5-49(4) shall be found and considered in determining sentence in every case in which a defendant is convicted of the capital offenses defined in subdivisions (1) through (4) of subsection (a) of Section 13A-5-40."
Section 13A-5-45(e) further provides, in pertinent part, that "any aggravating circumstance which the verdict convicting the defendant establishes was proven beyond a reasonable doubt at trial shall be considered as proven beyond a reasonable doubt for purposes of the sentence hearing." Thus, we find no plain error here.

XVII.
In accordance with Rule 45A, Ala.R.App. P., we have examined the record for any plain error with respect to Gamble's capital-murder convictions and death sentence, whether or not brought to our attention or to the attention of the trial court. We find no plain error either in the guilt phase or in the sentencing phase of the proceedings that were held before the jury; therefore, we affirm Gamble's conviction for the capital offense of murder committed during a robbery in the first degree, as well as his sentencing before the jury. However, for the reasons stated below, we find it necessary to remand this case to the trial court for resentencing.
After the jury convicted Gamble of the capital offenses charged in the indictment, a separate sentence hearing was held before the jury in accordance with §§ 13A-5-45 and 13A-5-46, Ala.Code 1975. After hearing evidence concerning aggravating and mitigating circumstances; after being properly instructed by the trial court as to the applicable law; and after being correctly advised as to its function in reference to the finding of any aggravating and mitigating circumstances, the weighing of those circumstances, if appropriate, and its responsibility in reference to the return of *448 an advisory verdict, the jury, by a vote of 10-2, recommended that Gamble be sentenced to death by electrocution.
Thereafter, the trial court held another hearing, in accordance with § 13A-5-47, Ala.Code 1975, to aid it in determining whether it would sentence Gamble to life imprisonment without parole or to death as recommended by the jury. The trial court ordered and received a written presentence investigation report, as required by § 13A-5-47(b). Upon conclusion of the hearing, the trial court entered specific written findings concerning the aggravating circumstances enumerated in § 135-49, Ala.Code 1975, the mitigating circumstances enumerated in § 13A-5-51, Ala.Code 1975, and any mitigating circumstance found to exist under § 13A-5-52, Ala.Code 1975, as well as written findings of fact summarizing the offense and Gamble's participation in the offense. It is in the trial court's written findings that we find plain error.
In its findings of fact, the trial court found the existence of one statutory aggravating circumstance: that the murders were committed while Gamble was engaged in the commission of a robbery, see § 13A-5-49(4), Ala.Code 1975. The trial court found the existence of one statutory mitigating circumstance: (1) that Gamble was 18 ½ years old at the time of the offense, see § 13A-5-51(7), Ala.Code 1975. The trial court did not find the statutory mitigating circumstance of no significant history of prior criminal activity. See § 13A-5-51(1), Ala.Code 1975. Although the trial court did not specify in its written findings why it found that the statutory mitigating circumstance of no significant history of prior criminal activity did not apply, our reading of the record, particularly discussions between the attorneys and the trial court during sentencing, seems to indicate that the failure to find this mitigating circumstance was based on the erroneous belief that any evidence of prior criminal activity, regardless of whether such activity resulted in a conviction, could be used to negate the existence of the statutory mitigating circumstance. We note that in its appellate brief, the attorney general's office did not, in its review of the propriety of Gamble's death sentence, make any mention of the trial court's apparently erroneous written findings.
Because only convictions can negate the statutory mitigating circumstance of no significant history of prior criminal activity, see Parker v. State, 587 So.2d 1072 (Ala.Cr.App.1991), the trial court erred in using Gamble's "prior bad acts" or "prior criminal activity," none of which appears from the record to have resulted in a conviction, to negate the existence of the statutory mitigating circumstance. Accordingly, this case is due to be remanded to the trial court with directions that that court make new findings as to the aggravating and mitigating circumstances in Gamble's case and reevaluate Gamble's sentence in light of this opinion. See Ex parte Henderson, 616 So.2d 348 (Ala.1992) (remanding a case for resentencing where the trial court failed to find the existence of three mitigating circumstances); Barnes v. State, 727 So.2d 839 (Ala.Cr. App.1997) (remanding a case for resentencing where the trial court improperly found the existence of an aggravating circumstance and improperly found one mitigating circumstance not to exist); and Hadley v. State, 575 So.2d 145 (Ala.Cr. App.1990) (remanding a case for resentencing where the trial court improperly found the existence of one aggravating circumstance and improperly found one mitigating circumstance not to exist). The trial court is further directed to resentence Gamble and, thereafter, to submit an order *449 satisfying the requirements of §§ 13A-5-47(d) and 13A-5-47(e), Ala.Code 1975, and including its findings of fact and conclusions to this court within 90 days.
AFFIRMED AS TO CONVICTIONS; REMANDED WITH DIRECTIONS AS TO SENTENCING.
McMILLAN, COBB, BASCHAB, and FRY, JJ., concur.

On Return to Remand
LONG, Presiding Judge.
We originally remanded this cause to the trial court with directions that that court make new findings as to the aggravating circumstances and the mitigating circumstances in LaSamuel Gamble's case and that it reevaluate Gamble's sentence in light of our opinion. See Gamble v. State, 791 So.2d 409 (Ala.Crim.App.2000). Specifically, we found that the trial court had erred in considering Gamble's "prior criminal activity" or "prior bad acts," none of which appeared from the record to have resulted in a conviction, to negate the existence of the statutory mitigating circumstance of "no significant history of prior criminal activity." See § 13A-5-51(1), Ala.Code 1975. On April 13, 2000, the trial court, on its return to our remand order, submitted an amended sentencing order that satisfies the statutory requirements, specifically finding the existence of the statutory mitigating circumstance of "no significant history of prior criminal activity." The trial court then reweighed the aggravating circumstances and the mitigating circumstances and has again sentenced Gamble to death.
In our original opinion, in accordance with Rule 45A, Ala.R.App.P., we reviewed the record for any plain error with respect to Gamble's capital-murder convictions and death sentence, whether brought to our attention or to the attention of the trial court. We found no plain error either in the guilt phase or in the sentencing phase of the proceedings held before the jury. In light of the trial court's amended sentencing order, we have likewise found no plain error or defect in the sentencing phase of the proceedings before the trial court.
We have also reviewed Gamble's sentence in accordance with § 13A-5-53, Ala. Code 1975, which requires that, in addition to reviewing the case for any error involving Gamble's capital-murder conviction, we review the propriety of the death sentence. This review shall include our determination of the following: (1) whether any error adversely affecting Gamble's rights occurred in the sentence proceedings; (2) whether the trial court's findings concerning the aggravating circumstances and the mitigating circumstances were supported by the evidence; and (3) whether death is the appropriate sentence in the case. Section 13A-5-53(b) requires that, in determining whether death is a proper sentence, we determine (1) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; (2) whether an independent weighing by this court of the aggravating and mitigating circumstances indicates that death is a proper sentence; and (3) whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and Gamble.
As we stated in our original opinion, after the jury convicted Gamble of the capital offenses charged in the indictment, a separate sentencing hearing was held before the jury in accordance with §§ 13A-5-45 and -46, Ala.Code 1975. The jury recommended a sentence of death, by a vote of 10-2. Thereafter, the trial court held another hearing, in accordance with *450 § 13A-5-47, Ala.Code 1975, to aid it in determining whether it would sentence Gamble to death as recommended by the jury or to life imprisonment without parole. Upon conclusion of the hearing, the trial court entered specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in § 13A-5-49, Ala.Code 1975, each mitigating circumstance enumerated in § 13A-5-51, Ala.Code 1975, and any nonstatutory mitigating circumstances found to exist under § 13A-5-52, Ala.Code 1975. The trial court's written findings also summarized the offense and Gamble's participation in it.
In its amended order, the trial court found the existence of one statutory aggravating circumstance: that the murder was committed while Gamble was engaged in the commission of a robbery, see § 13A-5-49(4), Ala.Code 1975. The trial court found the existence of two statutory mitigating circumstances: (1) that Gamble was 18 ½ years old at the time of the offense, see § 13A-5-51(7), Ala.Code 1975; and (2) that Gamble had no significant history of prior criminal activity, see § 13A-5-51(1), Ala.Code 1975. Pursuant to § 13A-5-52, Ala.Code 1975, the trial court heard testimony concerning Gamble's character and record and any of the circumstances of the offense that Gamble offered as a basis for a sentence of life imprisonment without the possibility of parole instead of death. In this regard, the trial court found that the following evidence presented by Gamble constituted nonstatutory mitigation: (1) Gamble's age and maturity; (2) the involvement of drugs in Gamble's life and the effect the drugs may have had in diminishing Gamble's capacity to understand and appreciate his actions; (3) the fact that Gamble was not the triggerman in the offense; (4) the relative culpability of the codefendant, who was the triggerman; and (5) Gamble's cooperation in providing complete statements with regard to the facts and circumstances of this case and other cases he had knowledge of. The trial court noted, however, that it found none of these nonstatutory mitigating circumstances to be "significant."
The trial court's sentencing order, as supplemented in its return to our remand order, reflects that after considering all the evidence presented, the arguments of counsel, the presentence report, and the advisory verdict of the jury and after weighing the aggravating circumstance against the statutory and nonstatutory mitigating circumstances, the trial court found that the aggravating circumstance outweighed the mitigating circumstances. Accordingly, the trial court sentenced Gamble to death. The trial court's findings concerning the aggravating circumstance and the mitigating circumstances are supported by the evidence.
After carefully reviewing the record, we find no evidence that the sentence was imposed under the influence of passion, prejudice, or any other arbitrary factor. Our independent weighing of the aggravating and mitigating circumstances indicates that death is the appropriate sentence in this case. Considering both this particular crime (murder during the course of a robbery) and this particular defendant, we find that the death sentence is neither excessive nor disproportionate to the penalty imposed in similar cases. See, e.g., Burgess v. State, [Ms. CR-94-0475, December 18, 1998] ___ So.2d ___ (Ala.Crim.App.1998); Clemons v. State, 720 So.2d 961 (Ala.Crim.App. 1996), aff'd, 720 So.2d 985 (Ala.1998), cert. denied, 525 U.S. 1124, 119 S.Ct. 907, 142 L.Ed.2d 906 (1999); Williams v. State, 710 So.2d 1276 (Ala.Crim.App.1996), aff'd, 710 So.2d 1350 (Ala.), cert. denied, 524 U.S. 929, 118 S.Ct. 2325, 141 L.Ed.2d 699 *451 (1998); Kuenzel v. State, 577 So.2d 474 (Ala.Crim.App.1990), aff'd, 577 So.2d 531 (Ala.), cert. denied, 502 U.S. 886, 112 S.Ct. 242, 116 L.Ed.2d 197 (1991); Brownlee v. State, 545 So.2d 151 (Ala. Crim.App.1988), aff'd, 545 So.2d 166 (Ala.), cert. denied, 493 U.S. 874, 110 S.Ct. 208, 107 L.Ed.2d 161 (1989); Hallford v. State, 548 So.2d 526 (Ala.Crim. App.1988), aff'd, 548 So.2d 547 (Ala.), cert. denied, 493 U.S. 945, 110 S.Ct. 354, 107 L.Ed.2d 342 (1989); Davis v. State, 536 So.2d 110 (Ala.Crim.App.1987), aff'd, 536 So.2d 118 (Ala.1988), cert. denied, 490 U.S. 1028, 109 S.Ct. 1766, 104 L.Ed.2d 201 (1989); and Cochran v. State, 500 So.2d 1161 (Ala.Crim.App.1984), aff'd. in part, rev'd in part, 500 So.2d 1179 (Ala. 1985), aff'd. on return to remand, 500 So.2d 1188 (Ala.Crim.App.), aff'd, 500 So.2d 1064 (Ala.1986), cert. denied, 481 U.S. 1033, 107 S.Ct. 1965, 95 L.Ed.2d 537 (1987).
Accordingly, Gamble's sentence of death is affirmed.
AFFIRMED AS TO SENTENCE.
McMILLAN, COBB, BASCHAB, and FRY, JJ., concur.
NOTES
[1] Presley was convicted of the capital murders of Burleson and Littleton, and was sentenced to death. We affirmed his conviction and death sentence in Pressley v. State, 770 So.2d 115 (Ala.Cr.App.1999), aff'd, 770 So.2d 143 (Ala.2000). Presley was also convicted of the robbery-murder of Marvin Smith, and was sentenced to death for that conviction as well. We affirmed his conviction and death sentence in Presley v. State, 770 So.2d 104 (Ala. Cr.App.1999). Although the spelling of the defendant's names in these two cases is different, they are the same individual. The record in this case indicates that the correct spelling is Presley.
[2] The record shows that McKenzie, who waited outside of the pawnshop in the car during the robbery and murders, pleaded guilty, pursuant to a plea agreement with the State, to two counts of murder. He was sentenced to 20 years to life for those convictions.
[3] There was no audio on the videotape.
[4] Rule 9.1(b)(2)(ii), Ala.R.Crim.P., was amended effective December 1, 1997, to allow a capital defendant to waive the right to be present at any stage of the proceedings, except sentencing.
[5] The record reveals that during individual voir dire, R.H. expressed strong reservations about the death penalty. (R. 536-50.) The record also reveals that several years before Gamble's trial, R.H. had been an employee of a company where a violent strike had occurred and several people had been killed. The prosecutor trying Gamble's case prosecuted several employees who had been involved in the incident at the company. Although R.H. told the prosecutor during individual questioning that the incident was over and that nothing could be done about it, he admitted that, at the time of the incident, he harbored hard feelings toward the prosecutor. The trial court found that these reasons, which were offered by the prosecutor in explaining his strike of R.H. (R. 927-37), were race-neutral and thus were the proper basis for a peremptory challenge.
[6] To the extent that Gamble's claim could be construed to be a claim that his responses to the interrogating officers were unequivocal requests for counsel, that claim is equally without merit. Gamble did not make an unequivocal or unambiguous request for counsel; he made no request at all. See Ex parte Cothren, 705 So.2d 861, 864 (Ala.1997), cert. denied, 523 U.S. 1029, 118 S.Ct. 1319, 140 L.Ed.2d 482 (1998).